**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **KEISHA BOYKIN,** | § | |
| **Individually, and on behalf of the** | § | |
| **Estate of Darren Boykin, and** | § | |
| **PARIS THORPE,** | § | |
| **As next friend of A.B.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:21-cv-106** |
| | § | |
| **JERRIKA WEAVER,** | § | |
| **BRENT HOBBS, and** | § | |
| **WILLIAM SCOTT,** | § | |
| *Defendants*. | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF

# Table of Contents

**Table of Authorities** ................................................................................................ 3

**SUMMARY** .............................................................................................................. 4

**I. PARTIES** ............................................................................................................... 5

**II. JURISDICTION AND VENUE** ........................................................................... 5

**III. FACTS AND ALLEGATIONS** ........................................................................... 6

**IV. CAUSES OF ACTION** ...................................................................................... 15

   **Count One - DELIBERATE INDIFFERENCE TO MEDICAL NEEDS** ............. 15

   **Count Two - FAILURE TO SUPERVISE** ..................................................... 20

**V. PUNITIVE DAMAGES** ..................................................................................... 23

**VI. DAMAGES** ....................................................................................................... 24

**VII. ATTORNEY'S FEES** ....................................................................................... 25

**VIII. JURY REQUEST** ........................................................................................... 25

**PRAYER** ................................................................................................................. 25

# <u>Table of Authorities</u>

## Cases

*Alderson v. Concordia Par. Corr. Facility*,
848 F.3d 415, 422 n.8. (5th Cir. 2017) ................................................................. 15

*Domino v. Tex. Dep't of Criminal Justice*,
239 F.3d 752, 755 (5th Cir. 2001) ................................................................. 15, 16

*Dyer v. Houston*,
955 F.3d 501, 506 (5th Cir. 2020) ................................................................. 15

*Easter v. Powell*,
467 F.3d 459, 461–65 (5th Cir. 2006) ................................................................. 15, 16

*Estelle v. Gamble*,
429 U.S. 97, 103 (1976) ................................................................. 15

*Farmer v. Brennan*,
511 U.S. 825, 837 (1994) ................................................................. 15

*Galvan v. Calhoun Cty.*,
719 F. App'x 372 (5th Cir. 2018) ................................................................. 15

*Goodman v. Harris Cty.*,
571 F.3d 388, 395 (5th Cir. 2009) ................................................................. 20, 21

*Hare v. City of Corinth, Miss.*,
74 F.3d 633, 645 (5th Cir. 1996) ................................................................. 16

*Harris v. Hegmann*,
198 F.3d 153, 159–60 (5th Cir. 1999) ................................................................. 15

*Johnson v. Treen*,
759 F.2d 1236, 1238 (5th Cir. 1985) ................................................................. 16, 17, 18, 19

*Smith v. Brenoettsy*,
158 F.3d 908, 911–12 (5th Cir.1998) ................................................................. 20, 21

*Thompson v. Upshur Cty., Tex.*,
245 F.3d 447, 457 (5th Cir. 2001) ................................................................. 15

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, KEISHA BOYKIN, individually, and on behalf of the Estate of Darren Boykin, and PARIS THORPE, as next friend of A.B, Plaintiffs, complaining of JERRIKA WEAVER, BRENT HOBBS, and WILLIAM SCOTT, and for cause of action will respectfully show unto the Court as follows:

> To establish deliberate indifference, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' "

*Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001); quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985).

## SUMMARY

On August 29, 2019, Texarkana Texas Police Officers Jerrika Weaver, Brent Hobbs, and William Scott knew that Darren Boykin was unable to breathe and was requesting help; however, they deliberately chose not to provide medical care resulting in Darren's death. Officer Weaver even laughed at Darren as he begged for help and became non-responsive in the back of her patrol vehicle on the way to the jail.

Due to the deliberate indifference by the Defendants to Darren's medical needs, Darren became non-responsive and died. Each of the Defendant officers in this case had a duty to provide adequate medical care for the arrestees in their custody and care. However, the Defendants in this case were deliberately indifferent to Darren's known medical needs, in violation of his Fourteenth Amendment rights. Darren's mother now sues for the wrongful death of her son, Darren's daughter now sues for the wrongful death of her father, and a survival action is being brought on behalf of Darren's estate for the pain and suffering Darren experience prior to his death.

# I.
## PARTIES

1.      Plaintiff Keisha Boykin is a resident of Montgomery County, Ohio.

2.      Plaintiff Paris Thorpe is a resident of Butler County, Ohio.

3.      Defendant Jerrika Weaver is an individual residing in Bowie County, Texas and is an officer with the Texarkana Texas Police Department and may be served at her place of employment at the Texarkana Texas Police Department located at 100 N State Line Ave #16, Texarkana, TX 75501, or wherever she may be found. Defendant Weaver is being sued in her individual capacity.

4.      Defendant Brent Hobbs is an individual residing in Bowie County, Texas and is an officer with the Texarkana Texas Police Department and may be served at his place of employment at the Texarkana Texas Police Department located at 100 N State Line Ave #16, Texarkana, TX 75501, or wherever he may be found. Defendant Hobbs is being sued in his individual capacity.

5.      Defendant William Scott is an individual residing in Bowie County, Texas and is an officer with the Texarkana Texas Police Department and may be served at his place of employment at the Texarkana Texas Police Department located at 100 N State Line Ave #16, Texarkana, TX 75501, or wherever he may be found. Defendant Scott is being sued in his individual capacity.

# II.
## JURISDICTION AND VENUE

6.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

7.     Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendant is domiciled and/or resides in the Eastern District of Texas, and all or a substantial part of the cause of action accrued in the Eastern District of Texas.

**III.**
**FACTS AND ALLEGATIONS**

8.     Plaintiff Keisha Boykin is the proud and loving mother of Darren Boykin (hereinafter referred to as "Darren"), deceased.

9.     A.B. is Darren's proud and loving eight-year-old daughter whose claim is being brought on her behalf by her mother, Plaintiff Paris Thorpe.

10.     At all times relevant to the subject matter of this litigation, Defendant Jerrika Weaver (hereinafter referred to as "Defendant Weaver") was an officer with the Texarkana Texas Police Department.

11.     At all times relevant to the subject matter of this litigation, Defendant Brent Hobbs (hereinafter referred to as "Defendant Hobbs") was an officer with the Texarkana Texas Police Department.

12.     At all times relevant to the subject matter of this litigation, Defendant William Scott (hereinafter referred to as "Defendant Scott") was a Sergeant with the Texarkana Texas Police Department.

13.     People in the custody of the Texarkana Texas Police Department are dependent upon the Texarkana Texas Police Officers to provide them with medical care.

14.     On August 29, 2019, around 2:15 p.m., Darren was running from Texarkana College Police Department (TCPD) Officers who suspected him of the misdemeanor crime of theft.

15.     The TCPD officers chased Darren from Texarkana College campus to 2312 College Dr., over half a mile.

16.     On the afternoon of August 29, 2019, the temperature in Texarkana, Texas was extremely hot.

17.     The TCPD officers detained Darren in handcuffs and waited for Texarkana Texas officers to arrive to transport him to the Jail.

18.     Defendant Weaver arrived.

19.     While Darren was in handcuffs, he continued to want to lay down.

20.     Darren was having trouble breathing as he laid on the ground.

21.     Defendant Weaver, knowing that Darren had just run over a third of a mile during the heat of August, was having trouble breathing, and needed to lay down, did not call for medical personnel to evaluate Darren.

22.     Instead, Defendant Weaver and the Texarkana College officers lifted the handcuffed Darren off the ground and carried him to the patrol car.

23.     Darren was carried over to Defendant Weaver's marked patrol unit due to his inability to walk.

24.     Defendant Weaver took Darren by the right arm, a Texarkana College officer took him by the left arm, and another Texarkana College officer picked up his feet.

25.     In addition to having trouble breathing, Darren was also complaining that his leg hurt.

26.     Defendant Hobbs then arrived.

27.     After Darren was placed in the hot patrol car, Defendant Hobbs got water and gave it to Texarkana College Police Officer Altamirano.

28.     A few moments later, Defendant Hobbs heard some loud, but muffled yelling sounds coming from the patrol unit.

29.     Defendant Hobbs opened the door of the patrol unit and Darren told him that he couldn't breathe.

30.     Defendant Hobbs acknowledged in his report following this incident that when he heard Darren state that he couldn't breath, Defendant Hobbs observed that Darren was breathing hard if he was out of breath.

31.     Defendant Hobbs did not provide Darren with water as he had just provided Officer Altamirano.

32.     Defendant Hobbs, knowing that Darren was complaining of not being able to breath and was showing physical signs of being out of breath that supported this contention, chose not to call over the radio for medical assistance even though Defendant Hobbs had the ability to do so over his radio.

33.     Defendant Hobbs relayed to Defendant Weaver that Darren complained that he could not breathe.

34.     Defendant Weaver responded, "he'll be fine."

35.     Defendant Weaver showed a clear disregard for Darren's health once she was advised that she was told he had a felony warrant.

36.     Defendant Weaver then told Darren, "you can't call I can't breathe after you ran forever and then you have felonies," later at the jail while speaking to the jail nurse regarding Darren's health, Defendant Weaver stated, "he said he was gonna pass out but he is also being charged with a bunch of felonies so it's one of those things," and while explaining to other officers what happened during the transport she Defendant Weaver stated, "you know how he's got the <u>felony faint</u> in the backseat – 'oh I'm gonna pass out'

– he's fine," and even stated, "he kept saying he was tired, his legs hurt, he kept wanting to lay down – <u>normal stuff when you're getting charged with felonies</u>."

37.    Darren, obviously struggling to breathe, responded, "I can't."

38.    Defendant Weaver continued to not call for medical attention.

39.    Defendant Scott arrived.

40.    Defendant Hobbs relayed to Defendant Scott that Darren had complained that he could not breathe.

41.    This demonstrates that Defendant Hobbs believed it was a serious enough complaint to tell the sergeant who had arrived on scene.

42.    Being the Sergeant and supervisor on scene, Defendant Scott had the ability to call for medical assistance or direct Defendant Hobbs or Defendant Weaver to call for medical assistance for Darren.

43.    However, knowing that Darren was complaining that he could not breathe, Defendant Scott chose not to call for medical assistance for Darren, and instead, directed Defendant Weaver to transport Darren to the Jail.

44.    Despite Defendant Scott's instruction to take Darren to the Jail, both Defendant Hobbs and Defendant Weaver had the ability to call for medical assistance for Darren or to take Darren directly to the hospital.

45.    Defendant Weaver, knowing that Darren had just run over a third of a mile during the heat of August and was having trouble breathing, was unable to walk, and was complaining of his leg hurting, did not call for medical personnel to evaluate Darren.

46.    Instead, Defendant Weaver began driving Darren to the Bowie County Jail.

47.    Just before backing the patrol car away from the scene, Darren told Defendant Weaver, "I can't breathe."

48.     About a minute and a half later, while Defendant Weaver was driving, Darren again told her, "I can't breathe."

49.     In the middle of the transport at, Summerhill Rd. and Richmond Rd., Darren advised Defendant Weaver, "ma'am, I'm about to pass out."

50.     Darren stated that he was going to pass out three times.

51.     Defendant Weaver callously responded, "just lean against the glass."

52.     Darren then stated, "I can't even talk."

53.     Defendant Weaver responded, "ok."

54.     This demonstrates that Defendant Weaver heard Darren express that he was going to pass out and that he couldn't even talk.

55.     Instead of calling over the radio for medical care or driving to the hospital, which was on the way to the Jail, Defendant Weaver continued driving directly to the jail and simply responded to Darren that he should rest his head on the glass.

56.     Defendant Weaver, knowing that Darren ran a third of a mile in the August heat, his leg was hurting, he was not able to walk, he needed to be carried to the patrol car, and he was stating that he was going to pass out and he could not even talk, chose not to call over the radio for medical attention or to take Darren to the hospital, which was on the way to the Jail; but instead, simply to tell him to put his head on the glass.

57.     At Texas Blvd. and New Boston Rd., Darren leaned over to the left.

58.     Defendant Weaver attempted talking to Darren, but he was not responding.

59.     Defendant Weaver could no longer see Darren's face when she was trying to speak to him and saw that he was leaned now leaned over.

60.     Defendant Weaver asked Darren where he was staying.

61.     Darren did not respond.

62.     Defendant Weaver just said, "alright, you know you are still going to jail either way right?"

63.     Darren did not respond.

64.     Defendant Weaver looked back at Darren who was obviously unconscious and in need of medical attention.

65.     Defendant Weaver then sarcastically said, "ok."

66.     Defendant Weaver then looked back again at Darren who was still obviously unconscious and in need of medical attention.

67.     Defendant Weaver then started laughing at Darren.

68.     Defendant Weaver asked Darren if he was comfortable.

69.     Darren did not respond.

70.     Defendant Weaver then began humming, showing a complete disregard for the human being who could not breathe, had been begging for help in her backseat, and was actively dying.

71.     She did not see him as a human being, but simply a felon who she was not going to give medical care.

72.     Defendant Weaver then asked if Darren was getting air in the back seat.

73.     Darren did not respond.

74.     Defendant Weaver asked Darren again if he was getting air.

75.     Again, Darren did not respond.

76.     Defendant Weaver continued to look back at Darren who was obviously unconscious and in serious need of medical help due to the cries for help he had just made and the fact that he was now non-responsive.

77.     Defendant Weaver then told Darren, "you know somebody that passes out isn't able to stop themselves from falling forward, fun fact."

78.     It was clear that no matter how obvious it was that Darren was in need of medical attention, the fact that Defendant Weaver believed he was wanted for felonies meant she was not going to help him.

79.     Defendant Weaver, knowing that Darren ran a third of a mile in the August heat, his leg was hurting, he was not able to walk, he needed to be carried to the patrol car, he was stating that he was going to pass out and he could not even talk, he had leaned over so that his face could no longer be seen, and he was no longer responding to Defendant Weaver, chose not to call over the radio for medical attention or to take Darren to the hospital, which was on the way to the Jail; but instead, simply to tell him to put his head on the glass.

80.     Defendant Weaver drove passed Wadley Regional Medical Center after seeing Darren lean over so that his face could no longer be seen and after Darren was no longer responding to Defendant Weaver; however, she chose not to take Darren to the hospital and to continue driving to the jail.

81.     At Martin Luther King Jr. Blvd. and Texas Blvd., Darren began gagging and trying to take a breath.

82.     This occurred a street past Wadley Regional Medical Center, which Defendant Weaver had just driven past despite her knowledge of Darren's deteriorating and serious condition.

83.     When Defendant Weaver finally arrived at the Jail, Darren was still non-responsive to her as she continued trying to speak to him.

84.     Darren was unconscious.

85. Defendant Weaver tried waking him up by using a sternum rub, but he did not respond.

86. Defendant Weaver grabbed pulled him out of the car, placed him on the ground, and finally began giving medical attention by the way of performing CPR.

87. Darren was still restrained in handcuffs as Defendant Weaver began CPR.

88. Defendant Scott began assisting Defendant Weaver.

89. Finally, Defendant Weaver requested medical personnel from LifeNet and the fire department to respond to assist with Darren.

90. This call for medical assistance at the Jail was a call that Defendant Weaver could have made before transporting Darren when he was having trouble breathing, unable to walk, and complaining of being in pain; however, Defendant Weaver deliberately chose not to make that call or provide any medical assistance at that time.

91. This call for medical assistance at the Jail was a call that Defendant Weaver could have made while transporting Darren when she heard him complain that he was about to pass out and that he could not even talk; however, Defendant Weaver deliberately chose not to make that call or provide any medical assistance at that time.

92. This call for medical assistance at the Jail was a call that Defendant Weaver could have made while transporting Darren when she saw Darren lean over so that his face could no longer be seen he was no longer responding to Defendant Weaver; however, Defendant Weaver deliberately chose not to make that call or provide any medical assistance at that time.

93. This call for medical assistance at the Jail was a call that Defendant Weaver could have made while transporting Darren when he began gagging and trying to take a

breathe; however, Defendant Weaver deliberately chose not to make that call or provide any medical assistance at that time.

94.     LifeNet transported Darren to Wadley Regional Medical Center, the same hospital Defendant Weaver passed knowing that Boykin's health was deteriorating in her patrol car, for further medical attention.

95.     As a direct result of Defendant Weaver consciously choosing not to call for or provide medical assistance for Darren even though she drove directly passed the Wadley Regional Medical Center, despite being aware that he was having trouble breathing, was about to pass out, was having trouble speaking, and then actually saw him lean over and become non-responsive consistent with passing out, Darren lost his life.

96.     As a direct result of Defendant Hobbs consciously choosing not to call for or provide medical assistance for Darren, despite being aware that he was stating he could not breathe and was displaying obvious labored breathing, Darren lost his life.

97.     As a direct result of Defendant Scott consciously choosing not to call for or provide medical assistance for Darren or instruct Defendants Weaver or Hobbs to call for or provide medical assistance, despite being aware that Darren stated he could not breathe, Darren lost his life.

98.     The Defendants were at all times acting under the color of law.

# IV.
## CAUSES OF ACTION

### Count One

### DELIBERATE INDIFFERENCE TO MEDICAL NEEDS
### Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983
### Defendants Weaver, Hobbs, and Scott

99.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

100.     The Fourteenth Amendment guarantees pretrial detainees a right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Dyer v. Houston*, 955 F.3d 501, 506 (5th Cir. 2020) (citing *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (citing, *inter alia*, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976))).

101.     To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference. *Dyer*, 955 F.3d at 506 (citing *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994))).

102.     Darren had a constitutional right to medical care under the Fourteenth Amendment while in Defendants' custody.

103.     Refusing to treat a prisoner's complaints can give rise to Section 1983 liability. *Galvan v. Calhoun Cty.*, 719 F. App'x 372 (5th Cir. 2018); *Easter v. Powell*, 467 F.3d 459, 461–65 (5th Cir. 2006); *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 n.8. (5th Cir. 2017).

104.     An episodic-acts-or-omissions claim faults specific officials for their acts or omissions.

105.     As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "**whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge**." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996).

106.     An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter*, 467 F.3d at 463.

107.     Deliberate indifference is shown when a plaintiff properly alleges that officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756; quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

## Defendant Weaver

### Defendant Weaver was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

108.     Defendant Weaver was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Darren repeatedly stated he couldn't breathe, Darren's breathing was labored supporting his complaint that he couldn't breathe, Darren stated he was about to pass out, Darren became non-responsive in the back of the patrol car, and Darren became unconscious in the back of the patrol car.

109.     Thus, Defendant Weaver was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

**Defendant Weaver actually drew that inference.**

110.     Defendant Weaver actually drew this inference because she acknowledged his statements of not being able to breathe and that he was going to pass out, she continued to look at him throughout the drive and saw that he was unconscious, she continued to speak to him throughout the drive and was aware that he had become non-responsive.

111.     Further, Defendant Weaver's actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Darren repeatedly stated he couldn't breathe, Darren's breathing was labored supporting his complaint that he couldn't breathe, Darren stated he was about to pass out, Darren became non-responsive in the back of the patrol car, and Darren became unconscious in the back of the patrol car. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Weaver actually drew the inference that a substantial risk of serious harm existed.

112.     Accordingly, Defendant Weaver was deliberately indifferent to Darren's health and safety because Defendant Weaver "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care or summoning medical care for Darren prior to leaving the arrest scene and on the way to the jail – instead laughing at Darren. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

## Defendant Hobbs

### Defendant Hobbs was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

113.     Defendant Hobbs was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Darren stated he could not breathe and his breathing was labored in support of this contention.

114.     Thus, Defendant Hobbs was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

### Defendant Hobbs actually drew that inference.

115.     Defendant Hobbs actually drew this inference because he witnessed Darren's labored breathing and heard him complain that he could not breathe and then Defendant Hobbs relayed this information to both Defendant Weaver and Defendant Scott.

116.      Further, Defendant Hobbs' actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Darren stated he could not breathe and his breathing was labored which supported that contention. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Hobbs actually drew the inference that a substantial risk of serious harm existed.

117.     Accordingly, Defendant Hobbs was deliberately indifferent to Darren's health and safety because Defendant Hobbs "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care or summoning medical care for Darren. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

### Defendant Scott

### Defendant Scott was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

118.     Defendant Scott was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Darren had complained that he could not breathe and Defendant Hobbs took that complaint seriously enough to relay it to Defendant Scott.

119.     Thus, Defendant Scott was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

### Defendant Scott actually drew that inference.

120.     Defendant Scott actually drew this inference because he acknowledged when Defendant Hobbs relayed this information to him.

121.      Further, Defendant Scott's actual knowledge of the substantial risk can be inferred because it was so obvious and <u>the need was so apparent that even laymen would recognize that care is required</u> – as Defendant Hobbs took Darren's complaint that he could not breathe seriously enough to relay it to Defendant Scott and that complaint is extremely serious as people that can't breathe die. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Scott actually drew the inference that a substantial risk of serious harm existed.

122.     Accordingly, Defendant Scott was deliberately indifferent to Darren's health and safety because Defendant Scott "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care or summoning medical care for Darren. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

## Causation

123.     As a direct result of the Defendants failing to provide medical care and attention to Darren, Darren suffered physical injury, pain, mental anguish, and death for which Plaintiffs sue herein.

124.     These injuries were not caused by any other means.

125.     These Defendants were at all times acting under the color of law.

## Count Two

### FAILURE TO SUPERVISE
### Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983
### Defendant Scott

126.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

127.     In a § 1983 claim for failure to supervise or train, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998).

128.     "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Smith*, 158 F.3d at 912.).

129.     Defendant Scott was at all times acting under the color of law.

130.     Here, Defendant Scott failed to supervise Defendants Weaver and Hobbs.

131.     First, it is clear that Defendant Scott was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and Defendant

Scott actually drew the inference that a substantial risk of serious harm existed because Defendant Scott was aware that Darren had just ran a long distance, couldn't breathe, and his officer – Defendant Hobbs – took the complaint that he couldn't breathe seriously enough to relay it to Defendant Scott when Defendant Scott arrived on scene.

132.    However, despite this information, Defendant Scott instructed Defendant Weaver to transport Darren to the jail instead of calling for medical attention or taking him directly to the hospital.

133.    As a result, Defendant Scott was deliberately indifferent in failing to supervise Defendants Weaver and Hobbs.

134.    As a result, his failure to supervise Defendants Weaver and Hobbs amounted to deliberate indifference.

135.    Finally, there existed a causal link between Defendant Scott's failure to supervise and the violation of Darren's rights. *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 912.).

136.    Had Defendant Scott taken steps to ensure Defendants Weaver and/or Hobbs had provided Darren with medical care instead of simply ignoring him as he complained of being unable to breathe in the backseat of Defendant Weaver's patrol car, Darren would not have continued to suffer and ultimately died.

137.    As a result, (1) Defendant Scott failed to supervise Defendants Weaver and Hobbs; (2) a causal link exists between the failure to supervise and the violation of Darren's rights; and (3) the failure to supervise amounts to deliberate indifference." *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 911–12).

## Count Three

### <u>Wrongful Death</u>
### Against Defendants Weaver, Hobbs, and Scott

138.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

139.    Plaintiff Keisha Boykin is Darren Boykin's mother.

140.    Plaintiff Paris Thorpe brings this lawsuit on behalf of A.B, who is Darren Boykin's eight year old daughter.

141.    By reason of Defendants' deliberate indifference of failing to provide medical care to Darren, Defendants are liable for damages.

142.    To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983 and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

143.    Defendants' deliberate indifference, as described herein, caused the death of Darren Boykin, which violated Darren's constitutional right under the Fourteenth Amendment.

144.    Defendants' conduct that caused Darren's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendants are liable for their acts and infliction of emotional distress caused by the wrongful death of Darren Boykin.

145.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## Count Four

### Survival Action
### Against Defendants Weaver, Hobbs, and Scott

146.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

147.    Plaintiff Keisha Boykin brings this claim as Personal Representative of the estate of Darren Boykin.

148.    Darren Boykin died because of the Defendants' wrongful conduct.

149.    Darren Boykin would have been entitled to bring this action against the Defendants if he had lived.

150.    The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased.

151.    The Defendants are liable to the Estate of the deceased for the loss of Darren Boykin's life, pain and suffering, and the violation of his civil rights.

152.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

### V.
### PUNITIVE DAMAGES

153.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

154.    When viewed objectively from the standpoint of the Defendants, at the time of the occurrence, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

155.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendant Weaver, Hobbs, and Scott, Plaintiffs are entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

156.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

157.    Darren Boykin's injuries were a foreseeable event, which were directly and proximately caused by the Defendants' deliberate indifference shown toward him.

158.    As a result, Plaintiffs are entitled to recover all actual damages allowed by law. Plaintiffs contend the Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Darren's constitutionally protected rights. Thus, Plaintiffs are entitled to punitive damages against the Defendants.

159.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiffs have been forced to suffer:

    a.    Actual damages;

    b.    Loss of affection, consortium, comfort, financial assistance, protection, and care;

    c.    Pain and suffering and mental anguish suffered by Darren Boykin prior to his death;

    d.    Mental anguish and emotional distress suffered by Plaintiffs;

    e.    Loss of quality of life;

    f    Funeral and burial expenses;

    g.    Loss of service;

    h.    Loss of earnings and contributions to Plaintiffs;

    i.    Prejudgment interest; and

    j.    Post judgment interest.

160.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs seek to recover, and hereby request the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

161.    If Plaintiffs prevail in this action, by settlement or otherwise, Plaintiffs are entitled to and hereby demand attorney's fees under 42 U.S.C. §1988.

## VIII.
## JURY REQUEST

162.    Plaintiffs respectfully request a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiffs further pray for all other relief, both legal and equitable, to which they may show themselves justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com