IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| KEISHA BOYKIN, individually and on behalf of the Estate of Darren Boykin, Plaintiff, | § § § § | |
| DARREN BOYKIN, individually, Intervenor, | § § § | Civil Action No. 5:21-CV-106 |
| vs. | § § | |
| JERRIKA WEAVER, BRENT HOBBS, and WILLIAM SCOTT, Defendants. | § § § | |

**RESPONSE TO DEFENDANT'S MOTION TO STRIKE
INTERVENOR'S EXPERT WITNESS, STAN SMITH**

Intervenor **DARREN BOYKIN** files this Response to Defendants' Motion to Strike Intervenor's Expert Witness, Stan Smith. (Doc. 88). Because the arguments presented in the Defendants' motion are largely all matters for cross-examination and not matters that render Dr. Smith's expert opinions inadmissible, Defendants' motion to strike Stan Smith should be, in all things, denied.

**I.    Introduction**

This is a wrongful death claim against these Defendants for their killing of Mr. Boykin's son, Darren Boykin, Jr., in violation of Boykin, Jr.'s Constitutional, Fourth Amendment rights. Boykin, Sr. designated Dr. Stan Smith to address, and value, certain damages suffered by Boykin, Sr. as a result of the death of his son. As Defendants point out, Dr. Smith intends to address the pecuniary loss of Boykin, Sr., and Boykin, Sr.'s loss of the companionship and society of his son. To value those damages, Dr. Smith places

a value on: (1) the loss of financial support to Boykin, Sr. as the surviving father; (2) the loss of household/family services that in reasonable probability would have been provided by Boykin, Jr. to his father had Boykin, Jr. lived; and (3) the loss of society or relationship sustained by Boykin, Sr. (Doc. 88-1 at 1). Defendants claim that these opinions "are without foundation, are without supporting evidence, are not reliable, are not based upon accepted methodology, and are not relevant." (Doc. 88 at 4).

But, Smith's opinions are relevant to the damage elements Boykin, Sr. is entitled to recover. Each value Smith addresses pertain directly to the pecuniary loss and loss of companionship and society Boykin, Sr. may be entitled to—all well-established elements of damage for a wrongful death plaintiff. And each opinion has a foundation, supporting evidence, and is reliable. Smith provides a very detailed report, with accompanying tables, that spells out exactly how Smith arrived at his figures and the sound methodology he used to reach those values. At best, Defendants raise issues that are simply matters for cross-examination. Smith's opinions are therefore admissible and the motion to strike should be denied.

## II. Standards applicable to expert testimony

Under the Federal Rules of Evidence, the trial court must ensure that any and all scientific testimony or evidence is both relevant and reliable. Fed. R. Evid. 104(a); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). Rule 702, which was specifically amended in 2002 to codify *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), and its progeny, regulates the subjects and theories about which an expert may testify and

specifically confirms the role of judges as gatekeepers to exclude unreliable expert testimony. Fed. R. Evid. 702 & advisory committee's note (2000).

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In short, the overarching subject of a *Daubert* inquiry is "the validity and thus evidentiary relevance and reliability of the principles that underlie a proposed submission." *Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir. 1999).

### A. Qualifications.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier of fact in their search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). Additionally, Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." *Id.*; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (discussing witnesses whose expertise is based purely on experience). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). However, "Rule 702 does not mandate that an expert be highly qualified in order to testify

about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.; see Daubert*, 509 U.S. at 596.

### B. Relevance.

The relevance prong of *Daubert* does not refer to relevance "simply in the sense that all testimony must be relevant, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact at issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).

### C. Reliability.

Reliability simply depends on whether the reasoning or methodology underlying the testimony is scientifically valid. *Carlson v. Bioremedi Therapeutic Sys.*, 822 F.3d 194, 199 (5th Cir. 2016). Expert testimony must be grounded in the methods and procedures of science and be more than unsupported speculation or subjective belief. *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). To be reliable, then, the expert must furnish some objective, independent validation of his methodology. *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013).

Ultimately, the Court's role as gatekeeper should not supplant the role of the jury, before whom vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596. Questions related to the bases and sources of the expert opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. *Gaytan v. City of Rockdale, Tex.*, No. A-07-CA-884 LY, 2008 WL 11409597, at *2 (W.D. Tex. Nov. 6, 2008) (citing

*Primrose Operating Co. v. Nat'l American Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004)). Mere weaknesses in the factual basis of an expert's opinion bear on the weight of the evidence rather than its admissibility. *Id.* (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)). And, the trial court oversteps its role as the gatekeeper when it overtly challenges the expert's facts and data or "takes sides" on questions of fact. *See, e.g., Milward v. Acuity Specialty Prods. Grp.*, 639 F.3d 11, 22 (1st Cir. 2011).

### III. Stan Smith's opinions are sufficiently relevant and reliable.

At the outset, it is worth noting that Defendants do not question Smith's qualifications. Nor can they. Dr. Smith's C.V. demonstrates his extensive experience in the field of economics. *See* Smith's CV (Ex. 1 at 1). After receiving a degree from Cornell University, Dr. Smith went on to receive a master's degree in economics from The University of Chicago, and then a Ph.D. in economics, also from The University of Chicago, where he studied under Nobel Prize laureate Gary Becker, Dr. Smith's Ph.D. thesis advisor. (*Id.* at 2).

Dr. Smith has held numerous distinguished positions in the field of economics, including staff economist at the Federal Reserve Board of Governors in Washington, D.C., staff economist at Chase Bank, and consultant for Ibbotson Associates, Inc. (*Id.* at 1). Dr. Smith has also held various teaching positions at various colleges and universities, including The University of Chicago and DePaul University College of Law. (*Id.*).

Dr. Smith is the author and co-author of numerous articles, journals, and publications that deal with the issues at hand. Dr. Smith has made presentations before many states' bar associations and other lawyer associations and has conducted seminars

regarding litigation damage models in a variety of places, including Dallas and Houston. (*Id.* at 2-6, 7-12).

Additionally, Dr. Smith has been featured in numerous national presentations, including those from the American Bar Association's Tort and Insurance Practice, the American Law Institute-American Bar Association, CNN, and he has been profiled by both The Wall Street Journal and Who's Who in the World. (*Id.* at 7, 12). Dr. Smith also *wrote the book* on the issues involved in the case—economic damages. *See* Stan V. Smith, Ph.D., Michael L. Brookshire, Ph.D., *Economic/Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys*. (*Id.* at 3).

Instead, Defendants question the relevance and reliability of his testimony. In the process, the Defendants do nothing more than point to issues they claim are weaknesses in the underlying facts or data, largely relying on testimony from Boykin, Sr.'s ex-wife. (Doc. 88 at 5). Defendants ignore the thoroughness of Smith's Report, the detailed calculations he uses to reach his conclusions, and the fact that his Report is based on information obtained directly from Boykin, Sr. himself. (Doc. 88-1 at 3-12).

Defendants' arguments boil down to an argument that Intervenor's expert should have used better data or that the data that does exist does not support the opinions. For instance, Defendants claim that Boykin, Jr. had not contributed financially to Boykin, Jr. and, presumably, absent such past contributions there can be no future contributions to his father. (Doc. 88 at 6-7). Defendants' position, however, ignores Texas law and Boykin, Sr.'s own testimony.

It is well-settled that the wrongful death statute provides for the recovery of pecuniary damages which, under Texas law, may include lost wages. *See Carty v. State Office of Risk Mgmt.*, 733 F.3d 550, 560 (5th Cir. 2013) (noting that, "under Texas law, the damages recovered in a wrongful death action may include the lost wages …"). This makes sense given that, under the wrongful death statute, pecuniary losses encompass the reasonable contributions of the decedent to his family. *See Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1987); *Escobar v. City of Houston*, No. Civ.A.04-1945, 2007 WL 471003, at *3 (S.D. Tex. Feb. 11, 2007) (applying Texas law); *see also* State Bar of Texas, *Texas Pattern Jury Charges: General Negligence, Intentional Personal Torts & Workers' Compensation* PJC 29.6 (2020 ed.) (defining "pecuniary loss" to include the "reasonable contributions of a pecuniary value" that Boykin, Sr., in reasonable probability, would have received from his son had he lived). Boykin, Jr.'s lost *future* earnings and employee benefits are, thus, relevant to the total amount of money Boykin, Jr. would have had available to contribute to his father. Loss of Boykin, Jr. 's future earnings are, thus, relevant to Boykin, Sr.'s damages.

Defendants, however, conveniently focus only on Boykin, Jr.'s past since he was young when he was killed and had a limited work history. But evidence of Boykin, Jr.'s past wages is unnecessary and largely uninformative when predicting lost future earning capacity, especially for someone who was only 23 years old when he was killed. Moreover, in Texas, future earning capacity is measured by the "ability and fitness to work in gainful employment for any type of remuneration, including salary, commissions, and other benefits, *whether or not the person is actually employed.*" *Pilgrim's*

*Pride Corp. v. Smoak*, 134 S.W.3d 880, 899 (Tex. App.—Texarkana 2004, pet. denied) (emphasis added); *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 435, n.2 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (same). Loss of future earning capacity can, therefore, be measured even if the plaintiff was unemployed at the time of his death. *See Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35 (Tex. App.—Tyler 2003, pet. denied) (corrected op.). Future earning capacity is solely concerned with the person's capacity to earn money post-injury, not on his or her "actual earnings lost" after the event. *Strauss*, 67 S.W.3d at 435; *see Smoak*, 134 S.W.3d at 899 (explaining that earning capacity does not mean "actual wages, income, or other benefits received during the period inquired about."); *Reynolds*, 127 S.W.3d at 35 ("Loss of earning capacity is the proper measure of damages, not loss of earnings."). Thus, Defendants' focus on past data is misplaced.

This is why the calculations Smith relies on are necessarily based on future assumptions. These future assumptions were made necessary because Defendants killed Boykin, Jr. No one will ever know precisely how much Boykin, Jr. would have earned, or how much time he would have spent visiting and helping his father in other ways. But that does not mean those assumptions are without support.

Defendants seem to place a lot of stock in the testimony of the mother of Boykin, Jr.'s minor child, Paris Thorpe. (Doc. 88 at 5). In the process, they ignore significant aspects of Boykin, Sr.'s testimony.

Boykin, Sr. noted that his son worked with him as a florist and had helped him in the past with landscaping silk-coating jobs. (Ex. 2 at 18:22-19:3, 19:14-23). Boykin, Jr.

`

helped his father prior to being 18, and even helped when he got out of jail. (Ex. 2 at 20:2-4). In fact, Boykin, Sr. planned to turn the floral business over to his son's, including Boykin, Jr., when he retired. (Ex. 2 at 21:4-19). According to Boykin, Sr., his son was his "ace" and was the one he was counting on to run the business. (Ex. at 22:3-9).

Boykin, Sr. also had regular contact with his son after his son became an adult. In the nine-month period between December 2018 and the time of his death in August 2019, Boykin, Jr. came to Ohio to see his father, with his girlfriend and their baby (Boykin, Sr.'s grandson). (Ex. 2 at 33:7-13). Boykin, Sr. recounted that his son visited him 6-7 times during that period. (Ex. 2 at 33:22-25).

> Q. And you're saying roughly six or seven times after he first moved to Texarkana, he returned and visited with you?
>
> A. Visited with me and family, but he definitely come to my house, played basketball and check on the garden. Yeah. Yeah. We started a garden and, yeah.
>
> Q. Would he spend the night?
>
> A. He spent the night with us, yes.
>
> Q. Each occasion?
>
> A. Not every occasion, no. I would try to make them stay at my house, but I guess with his girlfriend and the baby, he didn't want to -- they want their own privacy.

(Ex. 2 at 35:2-14). Thus, contrary to the testimony of Ms. Thorpe, Boykin, Sr. had a good relationship with his son; there was never any falling out. (Ex. 2 at 35:18-25, 37:3-11). As Boykin, Sr. would later explain when asked about the things his son did for him, Boykin, Sr. recalled:

> We were building a garden together. That was something we did. And I can -- I can fix computers, but he's good at computers. I can tell you that. And he was training me on how to work on a computer. I'm not good at that. I believe I'm not. He counseled me. He counseled me. It sounds like I counseled him.
>
> I mean, we would -- I'm -- sometimes I have things I want to talk about, and I talk to [Boykin, Jr.] and get his opinion, because I -- I valued him, valued my son's opinion.
>
> He helped -- I bought a historical home, and he's good at handyman work. So stuff like I couldn't do the floor. He stripped and sanded my floors to keep my hardwood floors together. So I mean, there's so much that he done for me.

(Ex. 2 at 117:12-118:1).

Smith's assumptions are consistent with this evidence of the father/son relationship. (Doc. 88-1 at 4). Smith then calculates career earnings based on Boykin, Jr.'s level of education—a male age 18-24 with a GED. (*Id.*). There is nothing unreasonable about these calculations.

Fundamentally, Defendants' criticisms go to weight, not admissibility. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 596 (1993). As such, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than admissibility and should be left for the jury's consideration.[1] *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

The situation here is no different. Defendants may present their own expert at trial who has his own opinions regarding the value of the losses suffered as a result of the

---

[1] Notably, Defendants had the opportunity to depose Dr. Smith, but chose not to.

death of Boykin, Jr. Defendants, based on their alleged inaccuracies in the facts and data used by Dr. Smith, will certainly be entitled to vigorously cross-examine Smith on those facts and data. However, the appropriate place for all of this is trial. Smith should be allowed to present his opinions to the jury, and the Defendants should be allowed to attack them. In the end, the jury should decide the weight to be given his opinions. Defendants' motion to exclude Smith's entire testimony, however, should be denied.

## IV. Prayer

For these reasons, Intervenor Darren Boykin respectfully requests that this Court deny Defendants' Motion to Strike Stan Smith, and that this Court grant Mr. Boykin such other and further relief to which he may be justly and equitably entitled.

Respectfully submitted,

By:/s/ *Daryl K. Washington*
**Daryl K. Washington**
State Bar No. 24013714
dwashington@dwashlawfirm.com
**WASHINGTON LAW FIRM, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
Telephone: (214) 880-4883
Facsimile: (214) 751-6685

**ATTORNEYS FOR INTERVENOR, DARREN BOYKIN, SR.**

**Response to Defendants' Motion to Strike Expert Witness, Stan Smith**       Page 11 of 12
`

# CERTIFICATE OF SERVICE

      I hereby certify that on **June 12, 2023**, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

| | |
|---|---|
| Scott H. Palmer<br>scott@scottpalmerlaw.com<br>James P. Roberts<br>james@scottpalmerlaw.com<br>SCOTT H. PALMER, P.C.<br>15455 Dallas Parkway, Suite 540<br>Addison, Texas 75001<br>*Attorneys for Plaintiffs* | Robert W. Weber<br>bweber@smithweber.com<br>SMITH WEBER, L.L.P.<br>5505 Plaza Drive<br>Texarkana, Texas 75503<br>**Attorney for Defendant, Jerrika Weaver** |
| Darren K. Coleman<br>darren.coleman@boonlaw.com<br>BOON, CALK, ECHOLS, COLEMAN &<br>GOOLSBY, P.L.L.C.<br>1800 W. Loop 281, Suite 303<br>Longview, Texas 75604<br>*Attorney for Defendants, Brent Hobbs<br>and William Scott* | |

                                                    */s/ Daryl K. Washington*
                                                    DARYL K. WASHINGTON