**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **PARIS THORPE, Individually and on** | § | |
| **behalf of the Estate of Darren Boykin,** | § | |
| *Plaintiff,* | § | |
| **DARREN BOYKIN, SR., individually,** | § | |
| *Intervenor Plaintiff,* | § | |
| | § | |
| **V.** | § | **Civil Action No. 5:21-cv-106-RWS-JBB** |
| | § | |
| **JERRIKA WEAVER, BRENT HOBBS,** | § | |
| **and WILLIAM SCOTT** | § | |
| *Defendants* | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

This case arises out of the tragic death of twenty-three year old Darren Boykin, Jr. ("Boykin, Jr.").[1] On August 29, 2019, after being arrested by Texarkana College Police Officers near Texarkana College and transported by Texarkana Texas Police Officer Jerrika Weaver ("Weaver") to the Bi-State Justice Building ("Bi-State jail"), Boykin, Jr. died as a result of complications of sickle cell trait caused by a half-mile foot chase immediately prior to his arrest. Paris Thorpe, as next friend of A.B. and on behalf of the Estate of Darren Boykin, Jr. ("Plaintiff"), and Darren Boykin, Sr., individually ("Intervenor") (together, "Plaintiffs"), bring this action pursuant to 42 U.S.C. § 1983 against Weaver and two other Texarkana Texas Police Officers present at the scene of the arrest, Brent Hobbs ("Hobbs") and William Scott ("Scott") (together with Weaver, "Defendants") for their alleged deliberate indifference to Boykin, Jr's medical needs. According to Plaintiffs, Defendants – knowing that Boykin, Jr. was having difficulty breathing

---

[1] The above-entitled and numbered cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes pursuant to 28 U.S.C. § 636.

and requesting help – were deliberately indifferent to Boykin, Jr.'s known[2] medical needs in violation of his Fourteenth Amendment rights by Defendants' failure to provide medical aid at the scene of the arrest and by Weaver's subsequent failure to provide medical aid during transport.

There are two pending motions for summary judgment before the Court: (1) Motion for Summary Judgment of Defendant Jerrika Weaver on Plaintiff and Intervenor's Deliberate Indifference Claim (Dkt. No. 89); and (2) Motion for Summary Judgment of Defendants Brent Hobbs and William Scott on Plaintiff and Intervenor's Deliberate Indifference Claim and Defendant William Scott's Motion for Summary Judgment on Supervisory Liability Claim (Dkt. No. 91). The Court, having carefully considered the relevant briefing and hearing arguments of counsel August 30, 2023, recommends the motions be **GRANTED**.

Specifically, the Court finds Defendants are entitled to summary judgment on the deliberate indifference (and supervisory liability) claims. Deliberate indifference requires showing Defendants were subjectively aware that Boykin Jr. faced a substantial risk of serious bodily harm and yet they disregarded that risk by failing to take reasonable measures to abate it. In the context of Plaintiffs' claims that Defendants denied Boykin, Jr. medical care, Plaintiffs must show a wanton disregard for his medical needs, such as a decision to intentionally treat him incorrectly. *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). However, the evidence shows that Defendants believed (as did the other officers at the scene of the arrest) that Boykin, Jr.'s labored breathing was due to exhaustion following the foot pursuit, and they failed to realize that there was a medical emergency. In this case, the risk of serious harm to Boykin Jr. "was anything but obvious," and the situation cannot rise to the level of a serious medical need for which "treatment has been recommended or for which the need is so apparent that even laymen would recognize

---

[2] While it is undisputed that Defendants were aware of Boykin Jr.'s difficulty breathing following the foot chase, it is also undisputed that no one, apparently even Boykin, Jr., knew he had sickle cell trait until after he was deceased.

that care is required." *Batiste v. Theriot*, 458 Fed. Appx. 351, 356 (5th Cir. 2012) (reversing a district court's denial of qualified immunity in a case where the plaintiffs' expert opined the decedent died of sickle cell trait which was caused by physical exertion when he fled from the officers) (citation omitted). Even if Defendants' failure to provide medical aid amounted to a constitutional violation, the Court would be compelled to recommend that summary judgment be granted on the basis of qualified immunity because Plaintiffs fail to demonstrate any constitutional violation, if established, violated clearly established law at the time of Boykin, Jr.'s arrest in 2019.

## Contents

I.       BACKGROUND……………………………………………………………………….5

II.      LEGAL STANDARDS………………………………………………………………….6

III.     SUMMARY JUDGMENT EVIDENCE…………………………………………………8

A.       Parties' evidence……………………………………………………………………..8

B.       Evidentiary issues…………………………………………………………………...10

C.       Material facts………………………………………………………………………11

IV.      APPLICABLE LAW…………………………………………………………………39

V.       DELIBERATE INDIFFERENCE…………………………………………………...42

A.       Whether Defendants had actual knowledge <u>at the scene of the arrest</u> that Boykin, Jr. faced a substantial risk of serious harm and failed to take reasonable measures to abate that risk……………………………………………………………………………..43

B.       Whether Weaver had actual knowledge <u>during transport</u> that Boykin, Jr. faced a substantial risk of serious harm and failed to take reasonable measures to abate that risk……………54

VI.      QUALIFIED IMMUNITY……………………………………………………………62

A.       Applicable law……………………………………………………………………...62

B.       Analysis……………………………………………………………………………64

VII.     RECOMMENDATION………………………………………………………………70

# I.    BACKGROUND

## A.    Plaintiffs' § 1983 claims

Keisha Boykin was the original Plaintiff and filed her Original Complaint (Dkt. No. 1) on August 29, 2021. She filed individually as the natural mother of Boykin, Jr. and as representative of her son's estate. On September 7, 2021, Keisha Boykin and Paris Thorpe, the natural mother of A.B., a minor child, filed a First Amended Complaint (Dkt. No. 7), adding Plaintiff Paris Thorpe, as next friend of the minor child. Thus, the amended complaint only added the wrongful death claim of minor A.B. On October 12, 2021, the Court granted Intervenor Boykin, Sr.'s unopposed amended motion to intervene.[3] Dkt. No. 15.

Paris Thorpe, as next friend of A.B., and Intervenor (Boykin, Jr.'s father) both bring wrongful death claims for injuries suffered by A.B. and Intervenor (respectively) arising from Boykin, Jr.'s death. Dkt. No. 7 at 4; Dkt. No. 21, ¶ 3. In addition to A.B.'s wrongful death claims, Paris Thorpe, on behalf of the Estate of Darren Boykin, Jr., also brings a survival action on behalf of Boykin, Jr.'s estate for the pain and suffering Boykin, Jr. experienced prior to his death.[4] Dkt. No. 7 at 4.

## B.    Defendants' motions for summary judgment

Defendant Weaver has filed a motion for summary judgment on all the deliberate indifference claims brought by Plaintiffs. Dkt. No. 89. Defendants Hobbs and Scott have filed a

[3] The Court has since determined that Intervenor's complaint (Dkt. No. 21, which is deemed filed September 9, 2021) was timely filed. See Dkt. Nos. 131, 142.

[4] On January 26, 2022, Keisha Boykin died. On March 2, 2022, the Court granted the Notice of Suggestion of Death and Unopposed Amended Motion to Substitute Proper Party Pursuant to Federal Rule of Civil Procedure 25(A) (Dkt. No. 36), substituting Paris Thorpe, the mother and sole guardian of A.B., for Keisha Boykin, deceased, as the Plaintiff bringing the estate's survival action. Dkt. No. 39. Thus, the survival claim of the estate is for the sole benefit of A.B. See Dkt. No. 131 at 23.

similar motion for summary judgment on the deliberate indifference claims brought by Plaintiffs and further seek summary judgment as to the supervisory liability claim asserted by Plaintiffs against Defendant Scott. Dkt. No. 91. Given the overlapping evidence and issues, the undersigned considers both motions together herein.

Defendants have moved for summary judgment on a number of grounds. Defendants first contend Plaintiffs cannot establish deliberate indifference to support their § 1983 claims. Additionally, with regard to the wrongful death claims, Defendants assert Plaintiffs cannot establish the causal link between Defendants' unconstitutional acts or omissions and the death of Boykin, Jr., as required by Texas's wrongful death statute. According to Defendants, "the expert medical testimony and evidence developed in this case establishes that, within a reasonable medical probability, Boykin, Jr. would *not* have survived the sickle cell crisis episode even if medical attention had been called to the scene of the arrest." Dkt. No. 89 at 29 (emphasis original); Dkt. No. 91 at 25 (emphasis original). In other words, Defendants assert emergent medical care would not have changed the outcome. *Id.* Finally, Scott maintains that Plaintiffs' supervisory liability claim against him cannot be established in this case because, in part, there was no underlying unconstitutional deprivation.

Defendants further claim they are entitled to qualified immunity because Plaintiffs cannot show that they committed a constitutional violation and that their actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.

## II.  LEGAL STANDARDS

### A.    Summary judgment standard

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

6

*Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). "A court considering a motion for summary judgment must consider all facts and evidence in the light most favorable to the nonmoving party." *Id.* (quoting *Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013)). "However, to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." *Id.* (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)). Furthermore, "when there is video evidence available in the record, the court is not bound to adopt the nonmoving party's version of the facts if it is contradicted by the record, but rather should 'view[ ] the facts in the light depicted by the videotape.'" *Id.* (quoting *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir.2014) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)), *cert. denied*, —— U.S. ——, 135 S.Ct. 137, 190 L.Ed.2d 45 (2014))).

## B.    Qualified immunity affirmative defense

Because the individual defendants asserted qualified immunity, Plaintiffs bear the burden of overcoming the affirmative defense. *Reed v. Nacogdoches Cnty.*, No. 22-40126, 2023 WL 3563017, at *2 (5th Cir. May 19, 2023) (citing *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)). Once the burden is on the plaintiff, "[t]he plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury." *Frederick v. LeBlanc*, No. 21-30660, 2023 WL 1432014, at *3 (5th Cir. Feb. 1, 2023) (quoting *Joseph*, 981 F.3d at 330). "The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." *Id.* (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citation omitted in *Frederick*)).

To succeed, Plaintiffs must prove "(1) that the official[s] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

conduct." *Reed*, 2023 WL 3563017, at \*2 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). The court may address the two prongs in any order. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

### III. SUMMARY JUDGMENT EVIDENCE

#### A.    Parties' evidence

Defendant Weaver attached the following to her motion for summary judgment: (1) Excerpts of March 8, 2023 Deposition of Dr. Francis G. O'Connor ("O'Connor Dep."); (2) Affidavit of Brandon Washington ("Washington Aff."); (3) Affidavit of Steven Gass ("Gass Aff."); (4) Affidavit of Vick Thornburg ("Thornburg Aff."); (5) Affidavit of Gisela Altamirano ("Altamirano Aff."); (6) Second Affidavit of Jerrika Weaver ("Weaver Second Aff."); (7) Weaver Body Camera Video (Flash Drive Per Order, Dkt. No. 86); (8) March 22, 2023 Report of Alex Germane ("Germane Report"); (9) Alex Germane Rear Compartment View with Mirror Field of View Overlay Video (Flash Drive Per Order, Dkt. No. 86); (10) Excerpts of July 19, 2022 Deposition of Brent Hobbs ("Hobbs Dep."); (11) Excerpts of July 19, 2022 Deposition of Jerrika Weaver ("Weaver Dep."); (12) Second Affidavit of Shawn Fitzgerald ("Fitzgerald Second Aff."); (13) Weaver Rear Seat Video (Flash Drive Per Order, Dkt. No. 86); (14) Plaintiffs' First Amended Complaint; (15) Intervenor Plaintiff's Amended Original Complaint; (16) medical records ("Def. Ex. 16"); (17) autopsy records ("Def. Ex. 17"); (18) December 18, 2022 Report of Stacey L. Hail, M.D. ("Hail Report"); (19) September 1, 2022 Report of Kevin R. Madison, CCP, PCI, PI ("Madison Report"); (20) Madison Revised Report dated January 2, 2023 ("Madison Revised Report"); (21) Texas Commission on Law Enforcement Persona Status Report regarding Kevin R. Madison ("Def. Ex. 21"); (22) Excerpts of March 6, 2023 Deposition of Kevin R. Madison ("Madison Dep."); (23) Second Affidavit of Joshua Mason ("Mason Second Aff."), with attached

transcript of the August 30, 2019 interview with Weaver (Ex. A) and Mason's Investigative Report (Ex. B) (herein, "Investigative Report"); (24) March 22, 2023 Report of Thomas Charles Kerss ("Kerss Report"); (25) November 14, 2022 Report of Francis G. O'Connor, M.D. ("O'Connor Report"); and (26) a copy of the opinion in *Reed v. Nacogdoches Cnty.*, No. 22-40126, 2023 WL 3563017 (5th Cir. May 19, 2023).

Hobbs and Scott attached to their motion for summary judgment the same exhibits attached as Exhibits 1-7, 10-21,[5] 23-24, and 26 to Weaver's motion. Additionally, Hobbs and Scott attached the following: (1) Second Affidavit of Brent Hobbs ("Hobbs Second Aff."), attached as Exhibit 8; (2) Second Affidavit of William Scott ("Scott Second Aff."), attached as Exhibit 9; (3) additional excerpts of March 6, 2023 Deposition of Kevin R. Madison ("Madison Dep."), attached as Exhibit 22; (4) Hobbs Body Camera Video, attached as Exhibit 25; (5) Scott Front Dash Camera, attached as Exhibit 26; and (6) Scott Body Camera Video, attached as Exhibit 27.

Plaintiffs attached the following evidence (Dkt. Nos. 114, 116) in support of their responses to Defendant' motions:[6] (1) Transcript of July 19, 2022 Deposition of Brent Hobbs ("Hobbs Dep."); (2) Transcript of July 18, 2022 Deposition of William Scott ("Scott Dep."); (3) Expert Report from Kevin Madison; (4) First Amended Complaint; (5) Expert Report from Dr. O'Connor; (6) Transcript of March 8, 2023 Deposition of Dr. O'Connor ("O'Connor Dep."); (7) Transcript of July 19, 2022 Deposition of Jerrika Weaver ("Weaver Dep."); (8) Weaver Body Camera (Flash Drive, Dkt. Nos. 117, 118); (9) Weaver Rear Dash Camera (Flash Drive, Dkt. Nos. 117, 118); (10)

---

[5] Whereas Weaver attaches only portions of Plaintiff's First Amended Complaint and Intervenor Plaintiff's Amended Original Complaint (Exhibits 14-15), Hobbs and Scott attached the complaints in their entirety.

[6] Intervenor did not file separate responses to Defendants' motions. Rather, Intervenor filed a Notice of Joinder and Adoption by Reference of Plaintiff's Responses to Defendants' Motions for Summary Judgment, joining in and adopting by reference all arguments and evidence included in and attached to Plaintiff's responses (Dkt. Nos. 113, 114, 115 and 116) to the Defendants' motions for summary judgment. *See* Dkt. No. 123.

Hobbs Body Camera (Flash Drive, Dkt. Nos. 117, 118); and (11) Scott Body Camera (Flash Drive, Dkt. Nos. 117, 118).

Defendant Weaver attached the following to her reply (Dkt. No. 127): (1) additional excerpts of March 6, 2023 Deposition of Kevin R. Madison ("Madison Dep."), attached as Exhibit 27; and (2) Madison Revised Report dated January 2, 2023 ("Madison Revised Report").

**B.    Evidentiary issues**

Defendants have filed two motions to strike. In their motion to strike Plaintiffs' retained police liability expert Kevin Madison, Defendants move to strike the following opinions from Madison's Report: (1) opinions 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 16, 17, and 19 that Defendants violated Fourteenth Amendment rights when not based on clearly established law; (2) opinions 1, 3, 4, 5, 6, 7, 8, 9, 15, 16 and 17 regarding TTPD General Orders and/or the Code of Ethics; (3) opinions 1, 3, 9, 13, 15, 18 and 19 based on negligence standards; (4) opinions 2, 13, 14, 16, 17, 18 and 19 to the extent they contain improper legal conclusions; (5) opinions 3, 4, 5, 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, and 19 regarding Boykin, Jr.'s medical condition(s); and (6) opinions 4, 5, 6, 7, 8, 10, 15, 17, 18, and 19 which reference an assertion that Boykin, Jr. "passed out" before being transported to the Bi-State jail. Dkt. No. 87. In their motion to strike Intervenor's expert Stan Smith, Defendants move to strike Smith's opinions as to alleged damages (the loss of financial support, loss of household/family services, and loss of society or relationship) sustained by Intervenor, Boykin, Jr.'s surviving father. Dkt. No. 88.

Defendants' motions to strike need not be addressed for purposes of Defendants' present motions for summary judgment. This does not mean the objections are without merit; rather, the cited evidence is insufficient to create a genuine issue of material fact for the reasons discussed below. *Cortez-Burlingame v. Galveston Cnty.*, No. 3:18-CV-00183, 2020 WL 2062263, at *4 (S.D.

Tex. Apr. 27, 2020), *report and recommendation adopted sub nom. Burlingame v. Galveston Cnty.*, No. 3:18-CV-00183, 2020 WL 4018830 (S.D. Tex. July 16, 2020), *aff'd sub nom. Cortez-Burlingame v. Galveston Cnty.*, No. 20-40540, 2022 WL 1114413 (5th Cir. Apr. 14, 2022) (citing *Dallas Police Ass'n v. City of Dallas*, No. 3:03-CV-0584D, 2004 WL 2331610, at *1 n.4 (N.D. Tex. Oct. 15, 2004) ("Because the court's decision is not affected even if the court assumes the objections have merit, it need not decide the objections and it overrules them as moot.").

## C.    Material facts[7]

Following an incident with Texarkana College Police Department ("TCPD") officers on August 29, 2019, Boykin, Jr. was transported by Texarkana Texas Police Department ("TTPD") officer Weaver to the Bi-State jail. Boykin, Jr. was unconscious upon arrival. Investigative Report at 3. CPR was attempted at the scene, and a LifeNet ambulance responded. *Id*. After being transported to Wadley Regional Medical Center, Boykin, Jr. died. *Id.* Texas Ranger Joshua S. Mason was contacted by TCPD Chief Steven Gass to assist with a Custodial Death Investigation.[8] Gass Aff., ¶ 3. Plaintiff and Intervenor have filed Fourteenth Amendment claims under § 1983 against three TTPD officers, alleging they each deliberately denied treatment for Boykin, Jr.'s serious medical needs following his arrest.

---

[7] The material facts set forth in this section represent the facts as discerned by the Court from the pleadings and the parties' respective evidentiary submissions, in light of the relevant summary judgment standard requiring the record be viewed in the light most favorable to the nonmoving party. Accordingly, these are the "facts" for purposes of summary judgment only; they may not be the actual facts. *See Willmore-Cochran v. Wal-Mart Assocs., Inc*., 919 F. Supp. 2d 1222, 1228 (N.D. Ala. 2013).

[8] As part of his investigation, Ranger Mason secured incident reports from TCPD Chief Gass and TCPD officers Altamirano and Thornburg as well as TTPD officers Weaver, Hobbs, and Scott. Mason Second Aff., ¶ 4. He also secured recorded statements from Gass, Thornburg, Altamirano, and Weaver. *Id.* He secured the body camera and rear camera video of Weaver's interaction with Boykin, Jr. *Id.*

### 1.    Events involving TCPD officers

Video footage from College Bowl in Texarkana, Texas depicts Boykin, Jr. walking to the Texarkana Community College campus on August 29, 2019 at 1:58 p.m. (and later running from the campus at approximately 2:09 p.m.). Investigative Report at 16. TCPD Chief Steven Gass ("Chief Gass") was in his office at the college at approximately 2:00 p.m. that day when he overheard Officer Vickey "Vic" Lynn Thornburg ("Thornburg") say a theft suspect was spotted at the Health and Science Building. *Id*. at 9.

At approximately 2:03 p.m., Texarkana College Dean of Workforce, Community, and Business Education, Brandon Washington ("Washington"), advised TCPD officer Gisela Altamirano ("Altamirano") that he had observed a young black male with a blue backpack on campus and that the physical description matched the description of a suspect involved in two prior thefts occurring on the campus earlier in August 2019. Gass Aff., ¶ 4; Thornburg Aff., ¶ 4; Altamirano Aff., ¶ 4. Altamirano immediately responded to the Health Occupations Building. Altamirano Aff., ¶ 5 (stating Thornburg also responded to the Health Occupations Building to assist in locating the suspect).

Thornburg made initial contact with Boykin, Jr. on the second floor and asked his name. Thornburg Aff., ¶ 6 (stating Boykin, Jr. appeared nervous and replied his name was "Jason"). Thornburg also asked for identification. *Id*.

Altamirano walked around the corner while Thornburg was speaking with Boykin, Jr. Altamirano Aff., ¶ 6. After looking at Altamirano, Boykin, Jr. "began shifting his body away from Thornburg and as Thornburg attempted to grab and detain the suspect, he slid off the backpack" and ran towards the stairway. *Id.* Thornburg fell to the floor, and Altamirano pursued the subject outside. *Id*., ¶¶ 6, 7. According to Thornburg, she notified Chief Gass by radio that the subject had

fled. Thornburg Aff., ¶ 8 (stating she looked out the window and observed Altamirano running north).

Boykin, Jr. ran across a field behind College Bowl, crossed Richmond Road, and "hid in a car wash bay at the intersection of Richmond Road and College Drive." Investigative Report at 5-6. Thornburg quickly left the building and entered the car Chief Gass was operating. *Id.* at 8; Gass Aff., ¶ 7. They drove toward the car wash. Investigative Report at 8.

Meanwhile, Altamirano pursued Boykin, Jr. on foot briefly, prior to being transported in a personal vehicle being driven by Washington. *Id.* at 2, 5-6; *see* Madison Revised Report at 6. As Washington's vehicle was driven to Boykin, Jr.'s location, Washington and Altamirano observed Boykin, Jr. "visibly tired and out of breath walk and slowly jog across Richmond Road to the car wash," where he "was bent over trying to catch his breath." Madison Revised Report at 6.

Boykin, Jr. began running again toward the EZ Mart parking lot. Investigative Report at 6. Altamirano exited Washington's vehicle and pursued Boykin, Jr. on foot. *Id.* Altamirano was able to "jump on the back area" of Boykin, Jr., causing them both to fall. *Id.*; *see also* Altamirano Aff., ¶ 9 (stating she was able to catch up to Boykin, Jr. and "grabbed him making us fall to the ground face down"); *see also* Madison Revised Report at 6.

Altamirano was able to handcuff Boykin, Jr.'s left wrist, but Boykin, Jr. put his right arm under his body. Altamirano Aff., ¶ 9. At that time, Chief Gass arrived and assisted in handcuffing Boykin, Jr.'s right arm. *Id.* Chief Gass stated that when he arrived he could see Altamirano sitting on top of Boykin, Jr., leaning forward with her legs straddling him holding onto her handcuffs. Gass Aff., ¶ 21. Chief Gass could see Boykin, Jr. still trying to raise up which is why Gass placed his left hand on the right side of Boykin, Jr.'s head to keep him from lifting up and was able to get his right arm behind his back to secure the handcuffs. *Id.*, ¶¶ 9, 21.

According to Altamirano, the temperature was hot, and she "just rolled over after Boykin was secured and attempted to breathe normal again." Investigative Report at 6. According to Kevin R. Madison, Plaintiff's expert witness, the temperature on the afternoon of August 29, 2019 was approximately 90 degrees Fahrenheit with a relative humidity of 52%, resulting in a Heat Index Temperature of 96 degrees Fahrenheit. Madison Revised Report at 5. Madison further states that Washington noted Altamirano, "who pursued Boykin mostly by riding in Mr. Washington's pickup truck, was so exhausted and out of breath that Mr. Washington was concerned for her." *Id.* at 7 (noting that Altamirano could not talk or communicate but nodded yes when Washington asked if she was okay and further noting that Boykin, Jr. was out of breath but continued talking and answering questions).

In her affidavit, Altamirano states as follows:

> At that point I rolled over onto my back since he had been handcuffed. While on my back I was attempting to catch my breath. I suffer from asthma. It was extremely hot that day and I believe the suspect probably ran one-half (1/2) mile from the Health Occupations Building to the scene of the arrest. The suspect was identified as Darren Boykin, Jr. He commented several times that he was out of breath and was instructed by Chief Gass to sit up. However, he refused to do so. He advised the officers that he could not breathe and was told it would be easier for him to breathe if he sat up. However, he still would not sit up even after officers tried to help him up.

Altamirano Aff., ¶ 10.

Thornburg described Altamirano as "winded" after the event concluded, and he overheard Boykin, Jr. say he could not breathe. Investigative Report at 8. Chief Gass and Thornburg tried to get Boykin, Jr. to sit up, but he just leaned forward and laid down again. Gass Aff., ¶ 10 ("He was told several times that sitting up would help him breathe easier but he continued to lay on his back."). According to Madison, Boykin, Jr.'s position, with his arms handcuffed and behind his back, pulled the chest and arms backward, "making it more difficult for Mr. Boykin to expand and

contract his chest, thus, impeding full inspiration of oxygenated air and full expiration of respiratory by-products." Madison Revised Report at 8.

Boykin, Jr. was searched incident to his arrest, and his identification card was located listing his name as Darren Boykin, Jr. Gass Aff., ¶ 11. Thornburg ran a check for warrants and was advised of a pending parole violation warrant from the State of Ohio. *Id.*; *see also* Thornburg Aff., ¶ 9. Boykin, Jr. was sitting upright on the ground while TCPD officers waited for TTPD offices to arrive to transport him to the Bi-State jail. Madison Revised Report at 8.

**2.    Events involving Defendant (TTPD) officers**

**a.    At the scene of the arrest**

***Officers Hobbs, Weaver, and Scott***

Meanwhile, at approximately 2:10 p.m., TTPD officer Brent Hobbs heard the police dispatcher report that Texarkana College police officers were in a foot pursuit with a subject.[9] Hobbs Second Aff., ¶ 4. TTPD officer William Scott, an on-duty sergeant for TTPD, also heard the police dispatcher report.[10] Scott Second Aff., ¶ 4. The subject was reported to be running from Texarkana College in the area of 2500 block of N. Robinson Road. The police dispatcher then advised that the Texarkana College police officers had the subject in custody and that the foot pursuit ended at or near 2314 College Drive. *Id.*, *see also* Hobbs Second Aff., ¶ 4.

Hobbs was in the area and decided to drive to the arrest location to determine if any additional help was needed. Hobbs Second Aff., ¶ 4. TTPD officer Jerrika Weaver also went to

---

[9] Defendant Hobbs has been a peace officer with the City of Texarkana, Texas since February 2008. Hobbs Second Aff., ¶ 2.

[10] Defendant Scott was employed as a peace officer with the City of Texarkana, Texas from June 2005 to October 2021. Scott Second Aff., ¶ 2. On August 29, 2019, Scott was on-duty as a sergeant for TTPD. *Id.* A sergeant is the first line supervisor to a police officer. *Id.* Scott was not a policymaker for the TTPD. *Id.*

the scene of the arrest to assist.[11] Scott Second Aff., ¶ 4; Weaver Body Camera Video, time mark 2:38.

Weaver arrived on the scene and assisted Chief Gass. Investigative Report at 2, 6, 8. When Weaver arrived, Boykin, Jr. was in handcuffs and breathing heavily. *Id*. at 11. Weaver testified she saw Altamirano at the scene bent over with her hands on her knees, exhausted from running. Weaver Dep. at 26:1-9; *see also id.* at 27:5-14 (stating she saw Altamirano with her arms over her head, indicating she was physically exhausted from running); Weaver Body Camera Video, time mark 2:48 (Altamirano telling Boykin, Jr. "it's easier if you sit up to breathe," and Boykin, Jr. responding, "I can't sit up"). Altamirano then stood with her hands above her head while Chief Gass held Boykin, Jr. in a sitting up position. *Id*. at 3:10. While the officers were asking Boykin, Jr. his date of birth, Boykin, Jr. stated his leg hurt. *Id.* at 3:34. During this time, Boykin, Jr. was communicating with the officers. O'Connor Dep. at 33:9-19 (stating from his review of the video that Boykin, Jr. "never lost consciousness," "did not pass out," and "he was communicating with the officers"); Gass Aff., ¶ 17 (stating that Boykin, Jr. did close his eyes but also repeatedly was able to talk and also gave the officers an alias of Jason Williams when asked his name).

As Hobbs was driving down College Drive, he observed TCPD officer Altamirano standing next to the roadway; she was leaning over with her hands on her knees breathing heavily. Hobbs Second Aff., ¶ 5. Hobbs presumed that she was exhausted from the foot pursuit. *Id.* Hobbs also observed Chief Gass standing by an individual, later identified as Boykin, Jr., laying on the ground. Hobbs then drove a short distance down College Drive, turned around and parked in front of 2314

---

[11] Defendant Weaver has been a peace officer since 2013. Weaver Second Aff., ¶ 2. She has been employed by the City of Texarkana, Texas since April 2016, working as a patrol officer for the Texarkana Texas Police Department. *Id*.; Investigative Report at 11.

College Drive. *Id.* As Hobbs was parking, he observed Boykin, Jr. being carried toward Weaver's patrol car.[12] Hobbs Second Aff., ¶ 5.

Chief Gass states Boykin, Jr. was asked to walk to Weaver's patrol unit but he said his legs hurt, so Gass and Altamirano lifted his legs and carried Boykin, Jr. partially to the patrol unit for transport. Gass Aff., ¶ 13. Weaver then stated, "he ran all this way and then he acts like he can't. . . function." Weaver Body Camera Video, time mark 3:50. Weaver helped TCPD officers carry Boykin, Jr. part of the way to her patrol vehicle. Weaver Body Camera Video, time mark 3:51-4:26.

Weaver asked Boykin, Jr. if he was going to get into the car by himself, and Boykin, Jr. said "yes;" he then walked the rest of the way and was able to get into the vehicle "under his own power." Gass Aff., ¶ 13. According to Altamirano, although Boykin, Jr. at first said he could not walk, he "ultimately agreed he could enter the patrol unit by himself and did so." Altamirano Aff., ¶ 11; *see also* Weaver Body Camera Video, time mark 4:51. Weaver buckled him into the back seat.

As Hobbs was exiting his patrol vehicle, he could see that Boykin, Jr. had been placed into the right back seat of Weaver's patrol vehicle and the door was shut. Hobbs Second Aff., ¶ 6. After Boykin, Jr. was inside the back of Weaver's patrol unit, he remained there for approximately four and one-half minutes before departure. Germane Report at 4; Weaver Rear Seat Camera, time mark 05:00 to 9:40. The rear seat camera video from Weaver's patrol unit depicts Boykin, Jr. in the rear compartment. The video also captures a reflected image of Weaver from the plexiglass divider that separates the front and rear compartments. Weaver Dep. at 23:1-12, 44:19-45:6. The

---

[12] Hobbs stated in his report that, as he was parking, he observed Chief Gass, Thornburg, and Weaver carrying Boykin, Jr. toward Weaver's patrol vehicle; however, upon reviewing the videos, Hobbs now realizes that it was Chief Gass, Altamirano, and Weaver that carried Boykin, Jr. to Weaver's patrol vehicle. Hobbs Second Aff., ¶ 5.

rear seat camera is mounted above the plexiglass divider inside the rear seat compartment. There was not a monitor or screen in the front compartment that provided Weaver a view of Boykin, Jr. the same as depicted in the rear seat video. Fitzgerald Second Aff., ¶ 4 & attached Exs. A&B (photos of rear seat camera).

Upon arrival, Hobbs retrieved a water bottle from his patrol vehicle and gave the bottle to Altamirano because she looked exhausted and was still breathing heavily. Hobbs Second Aff., ¶ 6; *see* Hobbs Dep. at 16:5-23 (stating he gave Altamirano two bottles of water and could have given water to Boykin, Jr. but did not); Weaver Body Camera Video, time mark 5:44. Hobbs stated in his deposition as follows:

> I provided Officer Altamirano water. She was breathing heavily. She just got finished with a lengthy foot pursuit wearing a black uniform with a bullet proof vest and all of her police gear, and she was gasping for air herself. Mr. Boykin was being placed in the back seat of a patrol car that had air conditioning in the vehicle, which in a short time would be on his way to the jail to get water from the jail and get relief from the foot chase.

Hobbs Dep. at 15:8-16.

Hobbs then stood near the mailbox in front of 2314 College Drive near Altamirano, Chief Gass, and Weaver. Hobbs Second Aff., ¶ 6; Weaver Body Camera Video, time mark 5:47. Altamirano was still bending over and reaching above her head at times. Weaver Body Camera Video, time mark 5:59 to 6:14.

Around this time, Hobbs heard a loud muffled sound from the backseat of Weaver's patrol vehicle, but he could not make out what was being said. Hobbs then approached Weaver's vehicle. Hobbs Second Aff., ¶ 6. From inside the back seat (with the door closed), Boykin, Jr. had called out, "Help!" while wincing and breathing heavily. Weaver Rear Seat Camera, time mark 5:48. He then made a loud noise and yelled, "Help!" a second time. *Id.*, time mark 6:15.

Hobbs opened the front door of Weaver's patrol vehicle. Hobbs Second Aff., ¶ 6; *see also* Hobbs Dep. at 17:1-8. As Hobbs opened the front door, Boykin, Jr. stated, "please turn the air on, I can't breathe, please." Weaver Rear Seat Video, time mark 6:21. The air conditioner was already on,[13] but Hobbs increased the airflow to high and told Boykin, Jr. "I got some air going here." *Id.*, time mark 6:26. On the video, the air flow can be heard increasing. *Id.*, time mark 6:28. Madison testified that Hobbs adjusted the air-conditioning to make Boykin, Jr. more comfortable. Madison Dep. at 234:3-8.

Hobbs then shut the front door. Weaver Rear Seat Video, time mark 6:32; *see also* Hobbs Second Aff., ¶ 7. Hobbs stated to Weaver, "He's back here hollering he can't breathe." Weaver Body Camera Video, time mark 6:30. Weaver responded, "He will be fine." *Id.* at 6:32. When Hobbs opened the back door, he had the following conversation with Boykin, Jr.:

Hobbs: "I got the air going, lean up"

Boykin, Jr.: "I can't breathe"

Hobbs: "You breathed long enough to get over here and run"

"The air is on back here in the back"

*Id.*, time mark 6:33 to 6:42.

Standing just outside the open door, Weaver stated, "You can't call I can't breathe after you ran forever and then you have felonies." *Id.*, time mark 6:43 to 6:47. As Weaver is talking,

---

[13] According to Madison, Weaver's patrol car was running, with the air conditioning on, when Boykin, Jr. was placed in the back seat; however, the metal and plexiglass partitions between the front and back seat areas "do not allow air conditioning to freely pass between the front seat area and the rear suspect area, which has no air conditioning ducts." Madison Revised Report at 10. During his deposition, Madison acknowledged he did not examine the patrol car in question so he "just assumed that there was no air vents in the backseat." Madison Dep. at 233:1-13.

Boykin, Jr. softly stated, "I can't."[14] Weaver Rear Seat Video, time mark 6:46. Someone (maybe Hobbs) asked, "got felony warrants?"[15] Weaver responded, "Apparently, that's what they're saying." *Id*., time mark 6:52.

Hobbs walked away from Weaver's patrol vehicle at time mark 6:52. Hobbs Second Aff., ¶ 8; Weaver Rear Set Video, time mark 6:52. Thus, the total amount of time of Hobb's interaction with Boykin, Jr. was approximately thirty-two (32) seconds. *Id.* Hobbs did not have any further interaction with Boykin, Jr. Hobbs Second Aff., ¶ 8.

Still standing  outside the open back seat door with Boykin, Jr.'s identification card in her hand, Weaver asked Boykin, Jr. if he could feel the air, to which he responded, "no." Weaver Body Camera Video, time mark 6:57. Weaver shut the back door as she said, "let me turn the vent, look." Weaver Rear Seat Video, time mark 7:00; Weaver Body Camera Video, time mark 7:00. Weaver then opened the passenger side front door and stood there. Weaver Body Camera Video, starting at time mark 7:04.

Chief Gass requested that Weaver transport Boykin, Jr. to the Bi-State jail. *Id*. at 7:26. According to Chief Gass, he did so because his vehicle did not have a protective screen between the front and rear seats. Gass Aff., ¶ 12. Chief Gass advised Weaver that he would have an officer meet her at the Bi-State jail to book Boykin, Jr. into jail because it was the TCPD that arrested Boykin, Jr. *Id*.; *see also* Weaver Second Aff., ¶ 5. Weaver agreed to transport Boykin, Jr. Gass Aff., ¶ 12.

---

[14] This was over four minutes after Weaver knew that Boykin, Jr. was no longer running. Weaver Dep. at 35:10-16. According to Weaver, she has experienced on several occasions a person saying they can't breathe when charged with several felonies. *Id.* at 35:23-36:3.

[15] Hobbs Body Camera Video does not start until after this interaction.

Boykin, Jr. again asked for "help" while Weaver was standing outside the open front passenger seat door. Weaver Body Camera Video, time mark 7:56. Weaver stated, "I'm going to help you get your way down to the jail." *Id.*, time mark 7:58. Boykin, Jr. then asked for "help back here," to which Weaver asked, "what do you need help with?" *Id.*, time mark 8:03. Boykin, Jr. mentioned his leg, and Weaver asked, "what did you do to your leg?" *Id.*, time mark 8:07. Boykin, Jr. stated he did not know, but that he needed to "stretch it." *Id.*, time mark 8:13. Weaver stated, "it's probably a cramp." *Id.*, time mark 8:15. Boykin, Jr. then stated, "I can't move." *Id.*, time mark 8:17. Weaver then asked Boykin, Jr. how long he had been here, and Boykin, Jr. responded about six months. *Id.*, time mark 8:20 to 8:26. This was approximately two minutes before departing the scene of the arrest.

A few moments later, when Weaver and Hobbs were standing by Weaver's patrol unit discussing Boykin, Jr., Weaver stated, "he says his legs hurt." *Id.*, time mark 8:43. Hobbs stated, "His legs hurt because he ran." Hobbs Body Camera Video, time mark 00.30.[16] Weaver commented she was going to take him to Bi-State. Weaver Body Camera Video, time mark 8:50.

Hobbs then noticed that Scott arrived on scene in his patrol vehicle.[17] Hobbs Second Aff., ¶ 10. Scott exited his patrol vehicle and began walking toward Weaver and Hobbs. Scott Body Camera Video, time mark 0:53. Scott also noticed that Chief Gass and a second Texarkana College officer were near Weaver's patrol vehicle. The following conversation occurred:

Officer Weaver: "I'm going to transport this guy down to the jail"

Scott: "Alright, ok"

---

[16] The Body Camera Video provided to the Court starts at this point.

[17] Hobbs had advised Scott, via police radio, that the subject was in custody, and that Texarkana College officers had requested TTPD to transport the subject to jail for them. Scott Second Aff., ¶ 4. Scott advised Hobbs that TTPD would transport. *Id.* Because Scott was in the area, he decided to drive to the arrest location to determine if any additional help was needed. *Id.*

Hobbs: "He says he can't breathe, but you can hear him hollering from the backseat"

Officer Weaver: "He just ran too much"

Scott: "Ok, fair enough"

Chief Gass: "Yeah, he ran from our campus"

*Id*., time mark 0:57-1:12;[18] *see also* Scott Second Aff., ¶ 5. During this time, Boykin, Jr. yelled out "Help!" a couple of times. Weaver Rear Seat Camera, time mark 9:00 to 9:14.

As Weaver got into the front seat of her patrol unit, Boykin, Jr. was softly stating in the back, "please, help me." Weaver Body Camera Video, time mark 9:22 to 9:25. Weaver asked, "Can you feel the air," to which Boykin Jr. responded, "No." *Id.*, time mark 9:28 to 9:31 (also stating "I can't breathe"). At that moment, Scott spoke to Weaver through the open front passenger window. *Id*., time mark 9:32; Scott Body Camera Video, time mark 1:20; Weaver Dep. at 42:14-43:11 (stating she heard Boykin, Jr. say he could not breathe when she was cut off by Scott). Scott advised Weaver to give him a "thumbs up" when she was ready to back out and leave the scene so that Scott could direct traffic for her. Scott Body Camera Video, time mark 1:30.

Scott then walked back toward the roadway to assist with directing traffic. Scott Second Aff., ¶ 6. Scott got back in his patrol vehicle at time mark 2:02, and then left the scene. *Id*. Thus, Scott was at the scene of the arrest for approximately one (1) minute and nine (9) seconds. *Id*.

Meanwhile, Hobbs also assisted with directing traffic so that Weaver could leave the scene and proceed to the Bi-State jail. Thereafter, Hobbs left the scene and returned to duty. Hobbs Second Aff., ¶ 10.

After Scott left the scene, he made the decision to proceed to the Bi-State jail to assist Weaver. Scott Second Aff., ¶ 7. The reason Scott chose to do so is because Boykin, Jr. had already

---

[18] The above conversation is also depicted on the Weaver Body Camera Video at time mark 9:05 and on Hobbs Body Camera Video at time mark 0:48

demonstrated that he would flee from the police. *Id.* Scott wanted to ensure that Weaver had assistance in the event Boykin, Jr. chose to flee again or resist transport. *Id.*; *see also* Scott Dep. at 64:12-17 (stating he made the decision to go to the jail to assist Weaver "in any way after her arrival at the jail, because it was an other than completely compliant arrest").

### Awareness at the scene of the arrest of whether Boykin, Jr. was in serious medical distress requiring medical assistance

All three of the Defendant officers testified that they did not think Boykin, Jr. was in serious medical distress at the scene of the arrest. In her second affidavit, Weaver stated as follows:

> At the scene of the arrest I could see Officer Altamirano and Boykin, Jr. Both appeared to be physically exhausted which seemed normal after running ½ mile in the August heat. I could hear Boykin, Jr. say, 'I can't breathe' and that his legs hurt. Both complaints seemed consistent for a suspect having fled from the TCPD. I also saw Boykin, Jr. breathing, heard him speak, holler, kick and respond to questions. I did not think he was in serious medical distress when he was put into my patrol unit or when we departed the arrest scene. . . .

Weaver Second Aff., ¶ 6. Weaver testified that based on the circumstances she did not feel there was a need to call for an ambulance or for medical assistance at the scene of the arrest. Weaver Dep. at 17:1-3; *see also id.* at 18:4-5 ("TC College and myself did not feel that there was anything pressing."), 95:16-21. Weaver explained "there was a Chief of Police out there and his subordinates and they did not make it vocal, and I did not feel that there was a medical need that needed to be met or necessity for medical attention." *Id.* at 96:2-5. According to Weaver, Boykin, Jr. was able to speak, yell, step into the patrol car, kick the back seat of her car, and acknowledge the officers. *Id.* at 36:8-20.

According to Hobbs' second affidavit, at no time did Hobbs believe or infer that Boykin, Jr. was experiencing any type of serious medical crisis, or that a substantial risk of serious harm existed. Hobbs Second Aff., ¶ 9. During his deposition, Hobbs stated that Boykin, Jr. told Hobbs that he could not breathe and asked if he could turn on the air conditioner. Hobbs Dep. at 17:9-15.

Hobbs turned the air conditioner on high to give Boykin, Jr. relief from the foot chase, which Hobbs "presumed he was exhausted from . . . running that long distance in the heat of that day." *Id.* at 17:16-19. Hobbs could see Boykin, Jr.'s chest and that he was inhaling and exhaling; he could also hear him breathing heavily at the same time as he was talking. *Id.* at 19:16-25. Hobbs acknowledged that it is possible that when Boykin, Jr. said he could not breathe, he was trying to communicate he was having difficulty breathing. *Id.* at 20:1-4; *see also id.* at 23:11-17 (acknowledging that difficulty breathing could be a serious or potentially life threatening situation). However, Hobbs did not see a medical need when he was speaking to Boykin, Jr. or that Boykin, Jr. was in any distress. *Id.* at 20:5-13. Hobbs construed Boykin, Jr.'s complaints that he could not breathe as related to physical exhaustion from the pursuit. *Id.* at 22:12-23:2, 32:23-33:12.

When asked how someone in custody in the back seat of a patrol car would get medical attention, Hobbs stated the officers would either call for medical attention or get medical attention "when they get to the jail." *Id.* at 24:11-20; *see also id.* at 28:16-23 (stating that although TCPD was the initial arresting agency and TTPD was the transporting agency, TTPD is responsible for safe transport while an arrestee is in its custody). Hobbs testified he "made the decision not to get medical attention because there was a Police Chief, two other officers from Texarkana College plus one of [his] fellow co-workers on the scene, as well, and not one of them indicated that there was a medical necessity or need because [Boykin, Jr.] did not exhibit any medical distress that needed medical attention." *Id.* at 26:16-22; *see also id.* at 38:11-13 (stating he "did not see that there was an immediate medical issue that required immediate assistance nor did any of the other officers on the scene").

During his short time at the scene of the arrest, Scott had no interaction with, or observation of, Boykin, Jr. Scott Second Aff., ¶ 6. Scott was the only sergeant from TTPD on the scene, and there was no TTPD officer there that ranked above him. Scott Dep. at 30:11-25. Scott had the authority to give Hobbs and Weaver orders and instructions. *Id.* at 31:1-3; *see also id.* at 93:19-94:3 (stating that as the highest rank at the scene of the incident, he had the ability and authority, if he had reached a conclusion that emergency medical services were needed based on the information and circumstances present, to direct Weaver to take Boykin, Jr. directly to the hospital to be observed); *see also id.* at 44:3-23 (stating that an officer can call for medical assistance without the supervisor's direction).

While at the scene of the arrest, Scott never believed or inferred that Boykin, Jr. was experiencing any type of serious medical crisis, or that a substantial risk of serious harm existed. Scott Second Aff., ¶ 9. Prior to arriving at the scene of the arrest, Scott was aware that a foot chase had occurred with Boykin, Jr. on a hot and humid August afternoon. *Id.* Based upon that information, and the information provided to Scott at the scene of the arrest by Hobbs, Weaver and Chief Gass, Scott fully believed that Boykin, Jr. was simply experiencing exhaustion from the foot pursuit with the Texarkana College officers. *Id.* Further, when Scott arrived at the scene, four experienced and well-trained police officers were present. *Id.* None of these officers ever mentioned or even suggested to Scott that Boykin, Jr. was in any type of serious medical distress. *Id.* Scott had known Hobbs, Weaver, and Chief Gass for years prior to August 29, 2019. *Id.* Scott trusted their judgment because he knew they would have summoned medical assistance if they in any way believed it was needed. *Id.*

Thus, even though he had the ability to call for medical assistance by police radio, Scott did not call for medical assistance and did not instruct Hobbs or Weaver to do so. Scott Dep. at

37:15-38:3. Scott testified that Hobbs told him at the scene of the arrest that Boykin, Jr. was hollering from the back seat that he could not breathe and that "it was related to foot pursuit and exhaustion." Scott Dep. at 33:9-36:14, 37:7-14 (stating Boykin, Jr. was hollering that he could not breathe after a "lengthy foot pursuit" in the heat). According to Scott, he had no indication that emergency medical attention was needed at that time given the information he was given, the presence of other competent officers who had viewed Boykin, Jr., and the background circumstances of the "relatively lengthy foot pursuit." *Id.* at 40:11-20; *see also id.* at 48:2-10 (stating he did not reach the conclusion that there was a medical emergency based on all of the circumstances, including the "lengthy foot pursuit, the other officers present, the information given to [him] that he was hollering and appeared to be exhausted, [and] had ran far" in the heat). Scott took information and circumstances and weighed them and did not reach the conclusion that Boykin, Jr.'s breathing issues constituted an emergency medical need. *Id.* at 84:3-90:10. According to Scott, the first time he learned that Boykin, Jr. was in any serious medical distress was when he approached Weaver's patrol vehicle at the jail. Scott Second Aff., ¶ 9; *see also* Scott Dep. at 91:17-18 ("Later at the jail, I arrived at the conclusion that he had a medical emergency, sir.").

Additionally, the TCPD officers and personnel present at the time of the arrest did not think Boykin, Jr. was in serious medical distress at the scene of the arrest. Altamirano stated Boykin, Jr. was breathing heavy but did not appear to be in any immediate medical distress. Altamirano Aff., ¶ 12 (stating that if she had believed Boykin, Jr. was in medical distress or needed medical attention, she would have immediately called the dispatcher for an ambulance or would have requested for Chief Gass to do so). Chief Gass stated it was apparent at the scene of the arrest that Boykin, Jr. was tired from running nearly one-half mile, and both Boykin, Jr. and Altamirano, who suffers from asthma, were breathing heavily. Gass Aff., ¶ 14. According to Chief Gass, he did not

believe that there was a need to call for medical assistance to treat Boykin, Jr. and that if he had thought so, he would have immediately contacted the dispatcher and requested medical assistance. *Id.*

Washington stated both Boykin, Jr. and Altamirano seemed visibly out of breath and gasping for air, and it seemed apparent to Washington that both of them were tired from having run a long distance in the August heat. Washington Aff., ¶ 7 (stating both were able to walk and talk and further stating that at no time at the scene of the arrest did Boykin, Jr. appear in serious medical distress, become unconscious, or briefly pass out). Similarly, Thornburg stated both Boykin, Jr. and Altamirano were breathing heavily, but both were able to talk. Thornburg Aff., ¶ 10. According to Thornburg, at no time while in custody of the TCPD at the scene of the arrest did Boykin, Jr. appear to be in a serious medical distress; rather, his condition seemed such as one would expect having been chased by police on foot for nearly one-half mile. *Id.*

According to Ranger Mason, there was nothing to indicate that Boykin, Jr. was in serious medical distress while at the scene of the arrest. Mason Second Aff., ¶ 7 ("Based on my review of the body camera video at the scene of the arrest, it was apparent that Boykin, Jr. and Officer Altamirano were physically exhausted after a foot pursuit of nearly ½ mile in the August heat.").

b.    **During transport**

*Officer Weaver*

Weaver transported Boykin, Jr. from the EZ Mart to the Bi-State jail. Investigative Report at 12. Upon initial departure, Weaver asked, "Do you want me to roll your window down?" to which Boykin, Jr. responded, "No, it'll make it hotter." Weaver Body Camera Video, time mark 10:13. Weaver then commented, "Okay, you just want me to keep the air on high?" and asked, "Do you feel it?" Boykin, Jr. responded, "Yes." Weaver Rear Seat Video, time mark 10:20.

During the next two minutes Weaver was on her cell phone speaking to the criminal investigation division of the TTPD. At one point during the conversation, Boykin, Jr.'s head fell forward and hit the divider, causing a "very quiet" noise on Weaver's side and causing her to look back. *See* Weaver Dep. at 47:3-48:13; Weaver Rear Seat Video, time mark 11:43 to 11:47.

According to her second affidavit, Boykin, Jr. was still moving around in the rear compartment and communicating with her during the first half of the transport. Weaver Second Aff., ¶ 7. Approximately two minutes and fourteen seconds after departure, Boykin, Jr. commented, "I'm about to pass out." Weaver Rear Seat Video, time mark 12:20. Weaver associated this with his physical exhaustion from the foot pursuit. Weaver Second Aff., ¶ 7. According to Weaver, she commented, "You'll be okay, just lean against the glass." *Id.*; Weaver Rear Seat Video, time mark 12:30. This was at least ten minutes since Boykin, Jr. had stopped running. Weaver Dep. at 52:1-9.

After another quick phone call, Weaver commented, "They'll get you some water up there at the jail, okay." Weaver Body Camera Video, time mark 13:04. Weaver attempted to look at Boykin, Jr. but had to scoot over and pull up on her steering wheel in order to look at his face; at that moment, Boykin, Jr. was leaned up against the glass, and Weaver saw Boykin, Jr. opening and closing his eyes. Weaver Dep. at 54:1-55:1. According to Weaver, she could see Boykin, Jr. "moving around, opening and closing his eyes as a normal person does, blinking, and he had his mouth opened to breathe like normal." *Id.* at 55:14-16; *see id.* at 56:13-18 (stating she saw his chest raising and lowering when she moved over to look at him).

Boykin, Jr. then stated, "I can't even talk." Weaver Body Camera Video, time mark 13:18. Weaver responded, "okay." Boykin, Jr. slumped over four minutes into the transport, leaning to his left in the opposite direction of the back door window. Weaver Rear Seat Video, time mark

14:20. Boykin, Jr. remained leaning to his left for the remainder of the transport. Germane Report at 4.

During the last half of the transport, Weaver continued to communicate with Boykin, Jr., though he did not respond.[19] Weaver Second Aff., ¶ 8. She was approximately four minutes from the jail garage and did not associate his silence with a cardiac event or other serious medical distress; rather, she continued to believe that he was physically exhausted. *Id.* (further stating that based on her training, experience, and judgment, "it is common for some detainees when going to jail to become silent"). Weaver testified she could not see Boykin, Jr. after that point because he was leaned to the side toward the middle of the vehicle. Weaver Dep. at 59:25-60:4; 66:3-18.

Boykin, Jr. was non-responsive when Weaver asked, "Where you staying at now?" and "What's your address?" and commented, "You know you're still going to jail either way, right." Weaver Body Camera Video, time mark 15:06 to 15:23. She then commented to herself, "okay." *Id.*, time mark 15:36. Weaver testified she thought Boykin, Jr. was ignoring her because "he did not want to respond to [her] questions." Weaver Dep. at 61:16-25. During this time, Weaver was passing Wadley Hospital. *Id.* at 63:3-17.

Approximately two minutes and ten seconds before arriving at the jail garage, Weaver asked several questions, all without response. Weaver Body Camera Video, time mark 15:52 to 16:29. She asked, "Are you comfortable?" Then, after hitting a pothole, Weaver looked in the rearview mirror and asked, "Are you getting air back there?" Weaver Dep. at 72:16-73:3. She then asked again, "Hey, Darren, are you getting any air?" *Id.* at 74:1-11. Despite the fact that Boykin,

---

[19] Video footage from an in-car camera indicate Boykin, Jr. appeared to become unconsciousness in the backseat during the last half of the transport. Investigative Report at 15; *but see* O'Connor Dep. at 73:5-18 (stating that although Boykin, Jr. had an "abnormal breathing pattern" in the latter portion of the transport when things worsened, Weaver could have  misconstrued what was going on because "he was still breathing; he was still conscious").

Jr. had not responded to her since telling her he could not talk, Weaver was still not concerned that there was a medical issue. *Id*. at 75:19-25.

Approximately one minute and nine seconds before arriving at the jail garage, Weaver turned left from Texas Boulevard onto Third Street approximately three-four (3-4) blocks from the Bi-State Building. Weaver had applied the brakes for a stop sign prior to turning onto Third Street. Weaver commented, "You know somebody that passes out isn't able to stop themselves from falling forward, right" as she completed the turn. Weaver then stated, "Fun fact." Weaver Body Camera Video, time mark 16:52; *see also* Weaver Second Aff., ¶ 9 (stating she did not see Boykin, Jr.'s body move forward when she applied the brakes). At time mark 17:14, Boykin, Jr. was still gasping for air but Weaver was unable to see him. Weaver Dep. at 78:5-20.

Weaver arrived at the Bi-State jail garage. Weaver Body Camera Video, time mark 18:00. Weaver Dep. at 80:2-4.

### *Awareness during transport of whether Boykin, Jr. was in serious medical distress requiring medical assistance*

Weaver repeatedly testified in her deposition that she could not see Boykin, Jr.'s face during the majority of the transport. Weaver Dep. at 15:25-16:1. According to Weaver, had she seen Boykin, Jr.'s face as she did when reviewing the rear dash camera video of her patrol unit after the incident, she would have concluded that medical attention was necessary and immediately taken Boykin, Jr. to the hospital. *Id.* at 94:19-95:15; *see also* Weaver Second Aff., ¶ 11 ("Had I observed such condition at any time during the transport, I would have taken Boykin, Jr. immediately to Wadley Regional Medical Center as it was in route to the jail.").

According to Weaver, the first time she had actual knowledge Boykin, Jr. was in medical distress was after they arrived in the jail garage. Weaver Second Aff., ¶ 10. Ranger Mason opined in his second affidavit that, based on his professional experience, training and judgment, "a

reasonable officer under the same circumstances would conclude from the video that the first time Weaver had actual knowledge of Boykin, Jr. being in serious medical distress is after they parked in the garage at the Bi-State jail facility." Mason Second Aff., ¶ 5. Dr. O'Connor acknowledged in his deposition that Weaver could have misconstrued Boykin, Jr.'s abnormal breathing pattern in the latter portion of the transport when things worsened because "he was still breathing; he was still conscious." O'Connor Dep. at 73:5-18.

c.    **At the Bi-State jail**

The transport from the scene of the arrest to the Bi-State jail garage took a little over eight minutes. Weaver Rear Seat Video, time mark 9:40 to 18:00.  Upon arrival at the jail garage, it took Weaver approximately one minute to park her patrol unit as she waited for a truck to move and then backed into the parking space. Weaver Body Camera Video, time mark 18:00 to 19:05.

Weaver stopped the patrol unit and stated, "Alright, we're here." *Id.*, time mark 19:09. Weaver exited and walked around to the passenger's side and opened the door. Boykin, Jr. was leaning away from Weaver. Weaver commented, "And I'm not picking you up and dragging you out either so come on, quit playing." Weaver stated, "Darren!" Weaver then leaned forward to perform a sternum rub on his chest and called out, "Darren!" four (4) times. *Id.*, time mark 19:30 to 19:55; *see also* O'Connor Dep. at 60:20-61:14 (stating he recalled from the recording the urgency in Weaver's tone of voice and thought Weaver "was very appropriate" and first recognized that Boykin, Jr. was "in extremis" at that moment in time when she first determined he was nonresponsive to her). Weaver then called out, "Sarge!" Weaver Body Camera Video, time mark 19:58.

After Weaver pulled Boykin, Jr. out of the car and onto the ground, Weaver Dep. at 93:3-7, she began CPR.[20] Investigative Report at 12. In her second affidavit, Weaver describes what happened as follows:

> When I opened the passenger door to the rear compartment I asked Boykin, Jr. to get out and over the next several seconds stated, 'Let's go!' and called his named, 'Darren!' several times. It was at this moment I discovered he was nonresponsive and in medical distress. I immediately called "Sarge!" to get the attention of TTPD Officer William Scott who had followed me to the jail. I checked for a pulse, did a sternum rub, removed Boykin, Jr. from the patrol unit and began CPR.

Weaver Second Aff., ¶ 10.

After Scott parked in the Bi-State jail garage,[21] Scott got out of his patrol unit and began walking toward the direction of where Weaver had parked her patrol vehicle. Scott Second Aff., ¶ 8. As Scott approached, he heard Weaver yell for him. *Id.* Scott then observed Weaver outside the rear passenger door and Boykin, Jr. lying on the floor. *Id.* Weaver advised Scott that Boykin, Jr. was not responding and did not have a pulse. *Id.*; Scott Body Camera Video, time mark 12:24; Weaver Body Camera Video, time mark 20:30. Weaver continued performing CPR while another officer attempted to remove the left handcuff. Weaver Body Camera Video, time mark 20:43 to 21:40 (Weaver noted "there's no response").

Via police radio, Scott and Weaver requested that LifeNet (i.e. an ambulance) and the jail nurse respond to the jail parking lot. Weaver Second Aff., ¶ 10; Scott Second Aff., ¶ 8; Scott Body Camera Video, time mark 12:50. During her deposition, Weaver testified that Scott called for LifeNet as the two of them began to give medical aid in the form of chest compressions to Boykin, Jr. Weaver Dep. at 81:11-19.

---

[20] The CPR was chest compressions only; there were no breaths given to Boykin, Jr. Weaver Dep. at 81:11-22.

[21] Scott arrived at the Bi-State jail garage and parked approximately nine minutes after leaving the scene of the arrest. Scott Body Camera Video, time mark 2:08 to 11:28.

Both Scott and TTPD Officer Clinton Akin assisted in providing CPR to Boykin, Jr. Scott Second Aff., ¶ 8; Scott Body Camera Video, time mark 13:48. The other handcuff was removed. Weaver Body Camera Video, time mark 21:56. Weaver stated, "TC had him in custody. I was just transporting." Weaver Body Camera Video, time mark 22:10; Scott Body Camera Video, time mark 14:05. Weaver checked Boykin, Jr. for a pulse and noted, "no pulse." Weaver Body Camera Video, time mark 22:56. Weaver held Boykin, Jr.'s head while Scott continued chest compressions and asked someone nearby, "You don't have one of those CPR masks do you?" *Id.*, time mark 23:08.

Weaver opened Boykin, Jr.'s eye and shined in a flashlight. *Id.*, time mark 23:18. She then stated, "Sarge, his pupils aren't responding." *Id.*, time mark 23:20; Scott Body Camera Video, time mark 15:16. Weaver stated, "Hurry, let's go!" Scott Body Camera Video, time mark 16:14. A jail nurse arrived first. *Id.* at 16:24. An AED was brought down by a jail nurse and the AED indicated "not to use." Investigative Report at 12; Weaver Body Camera Video, time mark 25:45.

At 2:38 p.m., the Fire Department and LifeNet arrived. Scott Body Camera Video, time mark 17:25. LifeNet arrived approximately four minutes and thirty-seven seconds after Weaver and Scott requested emergency medical care to the scene. Weaver Body Camera Video. LifeNet took over care of Boykin, Jr. before transporting him to the hospital. Scott Second Aff., ¶ 8; Scott Body Camera Video, time mark 18:00 (approximately five minutes after Scott first called LifeNet).

During this time, Weaver stated to emergency personnel, "he said he was going to pass out but he is also being charged with a bunch of felonies so it's one of those things." Madison Revised Report at 27; Weaver Body Camera Video, time mark 26:15.  Weaver then stated to a male officer, "you know how he's got the felony faint in the backseat – 'oh I'm gonna pass out' he's fine we get about two blocks from the jail and he's like. . . and then. . ."  Another officer then asked, "was

he out?," to which Weaver responded, "but he wasn't and so whenever I would slow on the brakes like his body would stay, like he would pull back." Weaver Body Camera Video, time mark 27:59 to 28:14; Madison Revised Report at 27.

A couple of minutes later, Weaver told a female taking notes, "So, we get here and so I thought he was just doing the felony faint I'm gonna slump over but I'm gonna. . .still keep myself from falling over and hitting myself." Weaver Body Camera Video, time mark 29:25 to 29:32; Madison Revised Report at 27. According to Weaver, "But I don't know what happened prior to the arrest… like he kept saying that he was tired, that his legs hurt, and he kept wanting to lay down, and stuff like that. . . normal stuff when you're getting charged with felonies, you know." Weaver Body Camera Video, time mark 30:09 to 30:21; Madison Revised Report at 28. The male officer commented that it could have been either narcotics or a "congenital defect in his heart that he didn't realize." Weaver Body Camera Video, time mark 30:21 to 30:27. Weaver then stated, "He was already gassed when they had him in custody. . .  because he ran from the college to the . . . gas station at Richmond and College to E-Z-Mart." *Id*., time mark 31:17 to 31:28.

### 3.    Subsequent events

LifeNet transported Boykin, Jr. to Wadley Regional Medical Center ("WRMC"). Scott Second Aff., ¶ 8. According to Scott's supplemental report, attached as an exhibit to his deposition, he spoke with an attending nurse who advised Scott that Boykin, Jr.'s condition was critical but that he had a pulse and that his breathing was assisted. Scott Dep., Ex. 7. Justice of the Peace Nancy Talley pronounced Boykin, Jr. deceased at approximately 6:51 p.m. and signed an order for autopsy and release of medical records. Investigative Report at 4.

WRMC records list the cause of death as sudden cardiac arrest; acute hypoxemic respiratory failure; hypoxic encephalopathy; acute renal failure; hyperkalemia; and shock liver.

Dkt. No. 89, Ex. 16, WRMC Records at 5, 23-24, 59. An autopsy was performed at the Southwestern Institute of Forensic Sciences in Dallas. The medical examiner, Dr. Emily Ogden, found sickle cell trait in multiple organs. Dr. Ogden concluded that Boykin, Jr. died as a result of complication of sickle cell trait. The Autopsy Report revealed Boykin, Jr. had sickled red blood cells in his lungs, liver, kidney, heart, and spleen. Autopsy Report at 3. According to the autopsy's conclusion, Boykin, Jr. died "as a result of complications of sickle cell trait," and the "physical exertion of running ˜ 1/3 mile, in Texas, in August, precipitated a sickle cell crises that ultimately led to the decedent's death." *Id*. at 5.

### 4. Alleged failures to provide medical aid

Plaintiffs allege Defendants "deliberately chose not to provide medical care resulting in [Boykin, Jr.'s] death." Dkt. No. 7 at 4; *see also* Dkt. No. 21, ¶ 11 ("Clearly, Boykin was not breathing normal and knowing that he was running in very hot temperature, the officers failed to provide Boykin with any medical attention, nor did they call for medical personnel to evaluate Boykin."). In his revised report, Plaintiffs' retained police liability expert, Kevin Madison, lists nineteen opinions, twelve of which address Weaver, Hobbs, and Scott. Grouping Defendants together, Madison opines Defendants "failed to summon Emergency Medical Services (EMS) to examine, assess, and treat" Boykin, Jr. at the scene of the arrest even though he was having difficulty breathing and complained of an inability to breathe while located at 2314 College Street, Texarkana, Texas. Madison Revised Report, ¶¶ 1, 2, 3, 4, 5, 6, 7, 9, 13, 14. Additionally, Madison opines that no reasonable police officer at the scene of the arrest would have failed to call EMS for medical assistance under the circumstances prior to transport when Boykin, Jr. (1) complained of trouble breathing then passing out causing officers to carry him to the patrol car; and (2)

screamed for help in the back of the patrol car and complained of an inability to breathe. *Id.*, ¶¶ 10, 11.

Madison offers two additional opinions specifically with regard to Weaver, asserting: (1) Weaver's failure to continue to monitor Boykin, Jr. during the transport to Bi-State jail "violated Texarkana Texas Police Department's General Orders, 10.01.1 Searching and Transport, Section 3 Procedures, Sec. 14. . ." (*id.*, ¶ 8); and (2) no reasonable police officer would have failed to stop their patrol car and immediately summon EMS for medical assistance after initiating transport when Boykin, Jr. "complained of an inability to breathe, vocalized that he was going to pass out, then slipped into an unconscious and unresponsive state." (*id.*, ¶ 12). Finally, Madison offers five opinions specifically with regard to Scott, alleging he violated his duties as a "police Sergeant and Supervisor." *Id.*, ¶¶ 15-19.

Defendants' retained police liability expert, Thomas Kerss, opines that all TTPD officers acted reasonably when faced with a detainee manifesting signs and symptoms commonly associated with extreme physical exertion. Kerss Report at 26. According to Kerss, Boykin, Jr. "otherwise appeared to have been in good, healthy physical condition, as his mother . . . reported to Ranger Josh Mason and as was evident by his frequent playing of basketball." *Id.* Boykin, Jr.'s complaints "closely aligned with the shortness of breath and fatigue that Officer Altamirano experienced after having chased and fought with Mr. Boykin." *Id.* Kerss further opines as follows:

> None of the officers involved in Mr. Boykin's arrest believed his complaints were related to anything more than his physical exertion, fatigue, and capture. This belief was supported by each officer present, plus Dean Washington in his statement to Ranger Mason and later to me. Each of the Texarkana College witnesses present and the defendants acknowledged that his symptoms bore common similarities to similar situations they had experienced in the past and was in line with normal expectations. Ranger Mason also expressed to me his conclusions supporting the reasonableness of their actions, and those beliefs align with my own personal experiences, support that conclusion and help form the basis for my belief that the

defendants' actions clearly aligned with what a reasonable peace officer would believe in that situation.

*Id.* at 26-27.

**5.      Medical causation**

In the opinions of both medical causation experts, the physical exertion of running one-half mile, in Texas, in August, could have precipitated a sickle cell crisis that ultimately led to Boykin, Jr.'s death. Defendants' expert, Dr. Stacey Hail, opines that "given the presence of sickle cell trait on hemoglobin electrophoresis and that fact that [Boykin, Jr.] had just engaged in a foot pursuit for ½ mile in August heat, sudden collapse due to sickle cell trait cannot be ruled out as a cause of death." Hail Report at 8 (opining another cause of death scenario that cannot be ruled out is stress cardiomyopathy). Dr. Hail opines there was no indication to summon LifeNet at the scene as it was unknown to the officers and also to Boykin, Jr. that he had a potential underlying medical condition that could put him at risk for sudden cardiac arrest after exertion. *Id.* at 12. According to Dr. Hail, it did not become apparent to her as a seasoned emergency physician while carefully reviewing Weaver's back seat footage that Boykin, Jr. was experiencing a medical emergency until time marker 14:50 when Boykin, Jr. was demonstrating a type of labored breathing consistent with agonal respirations. *Id.* It did not appear to Dr. Hail that Weaver was aware of this change in Boykin, Jr.'s physical condition because she was in the front seat driving. *Id.* at 13.

Dr. Hail opines "[w]ithin reasonable medical probability, more emergent medical attention would not have changed [Boykin, Jr.'s] outcome in this case." *Id.* "Even if [Boykin, Jr.] had been transported to the emergency department, emergency physicians would not have been aware of [Boykin, Jr.'s] underlying condition and more likely than not, would be unable to reverse the exertional sickling in time to prevent cardiac arrest." *Id.* at 12-13. Dr. Hail further noted that individuals that experience cardiac arrest due to ventricular fibrillation (typically from a

myocardial infarction or a "heart attack") have a better survival rate because ventricular fibrillation is a "shockable" rhythm; however, in Boykin, Jr.'s case, "the automated external defibrillator did not advise a shock because [Boykin, Jr.] was not demonstrating a shockable rhythm." *Id.* at 13.

Plaintiffs' medical expert, Dr. Francis O'Connor, provided a written report and was deposed. In his report, Dr. O'Connor opines that "[i]n my professional opinion, early recognition of an ECAST [Exercise Collapse Associated with Sickle Cell Trait] event in Mr. Boykin's case, with early medical intervention to include oxygen, and intravenous hydration, may have resulted in survival." O'Connor Report at 11. Dr. O'Connor further opines as follows:

> While it is not expected that a non-medical professional would recognize an ECAST event, Mr. Boykin displayed clear signs of distress that in my opinion warranted evaluation from a medical professional. In Mr. Boykin's case, this evaluation could have resulted in earlier medical assessment and intervention, including oxygen, hydration, and transport to an emergency facility, that may have saved Mr. Boykin's life.

*Id.* at 11-12.

During his deposition, Dr. O'Connor agreed that the occurrence rate of exertional sudden death with sickle cell trait is not very common and is very difficult to diagnose even for medical professionals. O'Conner Dep. at 35:18-38:2 (explaining ECAST has a "wide spectrum of presentations" and is a "very uncommon event" so "it makes it difficult and challenging for medical professionals to recognize"). Dr. O'Connor would not expect nonmedical professionals, including police officers, to be able to recognize an ECAST event. *Id.* at 46:18-22. Dr. O'Connor noted there is no literature or medical study available indicating at what point an ECAST event is irreversible and would lead to death. *Id.* at 54:13-20 (noting it "is not clear when that window opens and closes").

Although Dr. O'Connor testified "people who are treated early can survive," he could not put a medical "probability number on it." *Id.* at 55:25-56:4. When pressed during his deposition

regarding whether he could state with a reasonable medical probability that Boykin, Jr. would have survived with emergent medical care, Dr. O'Connor stated as follows:

> . . .  I'm making clear he did have an ECAST event. In my review of the literature, as there's thin literature in this area, the earlier you are identified, the earlier you are treated, the greater the probability you have of survival. It doesn't guarantee survival. But it gives you a chance. And and that's what I'm trying to communicate in my opinion, that there was a window for Mr. Boykin. Albeit, I can't tell you when it began and when it closed. That with early intervention, he would have had a chance for survival.

*Id.* at 56:17-57:3. Dr. O'Connor testified that if Boykin, Jr.'s condition had been identified early on and he had early access to EMS or the hospital, "it's possible that he could have survived." *Id.* at 57:4-17 (stating "he would have had the opportunity for early intervention in an emergency room for supportive care and a chance for survival"). In further addressing that Boykin, Jr. "would have had perhaps a better opportunity for survival if he had been identified on the ground and transported to a hospital or provided emergency medical care," Dr. O'Connor noted there are cases of ECAST where people are seen right away and may die and there are other cases where they are seen right away and they survive. *Id.* at 58:5-17.

## IV. APPLICABLE LAW

### A.    Denial of medical care

This lawsuit presents an episodic act or omission claim, thereby invoking the deliberate indifference standard. The Fifth Circuit has held that an arrestee's or pretrial detainee's Fourteenth Amendment claims are governed by the same legal standards the Supreme Court uses for a prisoner's Eighth Amendment claims.[22] *Reed*, 2023 WL 3563017, at *2 (citing *Baughman v.*

---

[22] The Constitution imposes a duty on the state to provide for the safety and wellbeing of the people it incarcerates. *Williams v. City of Yazoo, Mississippi*, 41 F.4th 416, 422–23 (5th Cir. 2022) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). For people already convicted of a crime, this duty stems from the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* at 423 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976)). For those like Boykin, Jr., who have not yet faced trial, it stems from due process clause of the Fourteenth Amendment instead. *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979)).

*Hickman*, 935 F.3d 302, 306 (5th Cir. 2019)); *see also Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996) ("After the initial incidents of a seizure have concluded and an individual is being detained by police officials but has yet to be booked, an arrestee's right to medical attention, like that of a pretrial detainee, derives from the Fourteenth Amendment."); *see also Williams v. City of Yazoo, Mississippi*, 41 F.4th 416, 423 n. 4 (5th Cir. 2022) (noting the Fifth Circuit is in the "slight majority" of circuits that apply the Eighth Amendment standard equally to denial-of-care claims by pre-and post-trial detainees).

> The Court of Appeals for the Fifth Circuit recently explained the standard as follows:
>
> To prove a Fourteenth Amendment deliberate indifference claim, a detainee must prove the jail official (1) was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (2) that she "actually drew the inference," and (3) that she "disregarded that risk." *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (quotation omitted). That means the detainee must show the jailer was aware of a "substantial risk of serious harm" to him and that she nevertheless "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Davis v. Lumpkin*, 35 F.4th 958, 963 (5th Cir. 2022) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). Actions by officials that are merely "inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (per curiam).

*Reed*, 2023 WL 3563017, at *2.

Put more succinctly, "[t]o prove deliberate indifference, [Plaintiffs] must show that the defendants knew that he faced a substantial risk of serious harm and failed to take reasonable measures to abate that risk." *Williams*, 41 F.4th at 423. The "knowledge inquiry is subjective," asking what Defendants "knew, not what they 'should have perceived.'" *Id*. (quoting *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979)). "But the reasonableness question is objective: It turns on whether the officials' response to a known risk was reasonable as a matter of law." *Id*. Subjective

deliberate indifference "is an extremely high standard to meet." *Baughman*, 935 F.3d at 307 (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001)).

In the context of denial of medical care like the allegations here, "pretrial detainees have a constitutional right . . . not to have their serious medical needs met with deliberate indifference." *Robinson v. Midland Cnty., Texas*, 80 F.4th 704, 709 (5th Cir. 2023) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001)). A serious medical need is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Id.* (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006)). Officials violate that right when they ignore, intentionally mistreat, or evince "wanton disregard" for an inmate's serious medical needs. *Id.* (citing *Gobert*, 463 F.3d at 346 (quoting *Domino*, 239 F.3d at 756)). *Gobert* provided examples of what actions do not constitute deliberate indifference, i.e., "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice . . . [or] a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Graham v. Hodge*, 619 Fed. Appx. 394, 396 (5th Cir. 2015) (quoting *Gobert*, 463 F.3d at 346). Plaintiffs must also show that harm resulted from the allegedly deliberately indifferent conduct. *Robinson*, 80 F.4th at 711 (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993)).

## B.     Supervisory liability

"Section 1983 does not create supervisory or *respondeat superior* liability." *Parker v. LeBlanc*, 73 F.4th 400, 404 (5th Cir. 2023) (quoting *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002)). Nonetheless, "[s]upervisory officials may be liable under § 1983 for their failure to adopt policies if that failure causally results in a constitutional injury." *Id.* at 404-05 (quoting *Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022)). "Liability only arises when the officials act, or fail to act, with 'deliberate indifference,' a 'disregard [for] a known or obvious consequence of [their]

action[s].'" *Id.* at 405 (quoting *Crittindon*, 37 F.4th at 186 (quoting *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011))). "[A] plaintiff must show either the supervisor personally was involved in the constitutional violation or that there is a sufficient causal connection between the supervisor's conduct and the constitutional violation."[23] *Id.* (quoting *Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 689 (5th Cir. 2003) (quotation marks and citation omitted in *Parker*)).

## V. DELIBERATE INDIFFERENCE

Plaintiffs bring Fourteenth Amendment deliberate indifference claims against Defendants. As noted above, a showing of deliberate indifference requires a detainee to show the officer was aware of a "substantial risk of serious harm" to him and that the officer nevertheless failed to take reasonable measures to abate that risk (i.e., "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs"). *Reed*, 2023 WL 3563017, at *2 (quoting *Davis v. Lumpkin*, 35 F.4th 958, 963 (5th Cir. 2022) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985))). Hobbs' and Scott's subjective awareness and the reasonableness of their response can only be examined at the scene of the arrest, whereas Weaver's awareness and response can be examined at the scene of the arrest and during her transport of Boykin, Jr.

---

[23] Plaintiffs bring a supervisory liability claim against Scott for his alleged failure to supervise his subordinate officers at the scene of the arrest. Thus, Plaintiffs assert Scott was personally involved in the alleged constitutional violation and do not allege that Scott implemented an unconstitutional policy that was "the moving force" behind Boykin, Jr.'s "constitutional violation." *Reed*, 2023 WL 3563017, at *5. Plaintiffs' law enforcement expert Madison agrees there is no evidence that Scott was a policymaker for the Texarkana Police Department. Madison Dep. at 235:25-236:15 (stating Scott is a policy enforcer); *see also* Scott Aff., ¶ 3 (stating he was not a policymaker for the City of Texarkana, Texas).

**A.  Whether Defendants had actual knowledge <u>at the scene of the arrest</u> that Boykin, Jr. faced a substantial risk of serious harm and failed to take reasonable measures to abate that risk**

At the outset, there is no evidence or argument that Defendants had actual knowledge that Boykin, Jr. had sickle cell trait or was undergoing an ECAST event. Plaintiffs instead principally focus on Defendants' knowledge that Boykin, Jr. was breathing heavily and Defendants' response to his labored breathing. Defendants admit they were aware of Boykin, Jr.'s labored breathing, and that after Boykin, Jr. was moved from the grass field to the back of Weaver's air-conditioned patrol car, Hobbs increased the airflow in response to Boykin, Jr.'s request to "please turn the air on, I can't breathe, please."

The evidence of record does not show that Defendants had subjective awareness that Boykin Jr.'s labored breathing was tied to a substantial risk of serious harm. When she arrived at the scene of the arrest, Weaver observed that both Altamirano and Boykin, Jr. appeared to be physically exhausted which seemed normal after running one-half mile in the August heat. Weaver Second Aff., ¶ 6. Although she heard Boykin, Jr. complain that he could not breathe and that his legs hurt, both complaints seemed consistent for a suspect having fled from the TCPD for that distance. *Id.*  Weaver did not think Boykin, Jr. was in serious medical distress when he was put into her patrol unit or when she departed the arrest scene. *Id.* ("If I had determined that Boykin, Jr. was in serious medical distress, I would have immediately called for emergency care assistance or requested another officer at the scene to do so.").

During Hobbs' brief encounter with Boykin, Jr. in the backseat of Weaver's patrol vehicle, which totaled thirty-two seconds, (1) Hobbs had a conversation with Boykin, Jr. wherein Boykin, Jr. said "I can't breathe;" (2) Hobbs provided additional air conditioning to Boykin, Jr.; and (3) Hobbs observed that Boykin, Jr. was alert and breathing, although with difficulty. According to

Hobbs, having previously observed Altamirano exhausted from the pursuit, he reasonably believed that Boykin, Jr.'s difficulty breathing was the result of being involved in a foot pursuit on a hot and humid August afternoon. No other officer on the scene spoke of any medical concerns of Boykin, Jr. At no time did Hobbs believe or infer that Boykin, Jr. was experiencing any type of serious medical crisis, or that a substantial risk of serious harm existed. Hobbs Second Aff., ¶ 9.

Scott had no interaction with, or observation of, Boykin, Jr. during Scott's approximately one minute at the scene of the arrest. During that minute, Scott had a brief conversation with Hobbs and Weaver, wherein Scott was informed that, although Boykin, Jr. said that he could not breathe, Boykin, Jr. was hollering and was exhausted from the foot chase. Scott believed the judgment of Hobbs and the other officers on-scene and believed that Boykin, Jr. was not in any serious medical distress. According to his second affidavit, the first time Scott became aware of Boykin, Jr. suffering from serious medical distress was after he arrived at the Bi-State jail and observed Weaver providing medical assistance to Boykin, Jr. Scott Second Aff., ¶ 9.

In their responsive briefing, Plaintiffs ask "th[e] Court to take judicial notice that an inability to breathe or difficulty breathing is a serious medical condition that requires medical attention." Dkt. Nos. 113 at 19, 115 at 15. At the hearing, the undersigned indicated the Court would take judicial notice of the fact that an inability to breathe or difficulty breathing can be a serious medical condition based on the facts of the particular case; however, the undersigned could not find that difficulty breathing necessarily is a serious medical condition that requires medical attention. Dkt. No. 151 (Transcript) at 59:9-14.

Plaintiffs are therefore left with the argument that Defendants misunderstood the source of Boykin, Jr.'s labored breathing, its seriousness, and the possible complications from his recent physical exertion. But "[u]nsuccessful medical treatment, acts of negligence, or medical

malpractice . . . [or] a prisoner's disagreement with his medical treatment, absent exceptional circumstances" "do not constitute deliberate inference." *Graham v. Hodge*, 619 Fed. Appx. 394, 396 (5th Cir. 2015) (quoting *Gobert*, 463 F.3d at 346). This is particularly true here, where Defendants were confronted with the same symptoms that one would expect from a physically exhausted person. *See Batist*e, 458 Fed. Appx. at 357-58 ("Further, the hereditary 'sickling' phenomenon described by Plaintiffs' expert is hardly the kind of obvious medical need that a non-medical expert would understand required attention. According to the Plaintiffs' expert's testimony, the trait appears through heavy breathing and fatigue, both of which are easily confused with symptoms of someone who had just run over a quarter mile while fleeing the police."). Thus, this case falls within the "symptoms-only scenarios" wherein the Fifth Circuit has found "[o]bserving [the injured's] behavior alone" was not enough to establish the defendants' knowledge. *See Williams*, 41 F.4th at 424-25.

The only other evidence Plaintiffs have to show actual knowledge on the part of Weaver at the scene (other than Boykin, Jr.'s complaints that he could not stand or breathe) is the testimony of their liability expert, Kevin Madison, that the video seems to show Boykin, Jr. passed out for one to two seconds before being placed into Weaver's patrol car. Madison Dep. at 59:23-60:18 (stating it occurred at time mark 3:49 on Weaver's Body Camera Video); *see also* Madison Revised Report at 4, 10, 12, 33, 78-81 (stating on numerous occasions throughout his revised report that Boykin, Jr. "briefly passed out" on the grass of the yard where he was arrested). However, Madison agreed in his deposition that right before that timestamp, the video shows Boykin, Jr. answering a question about his date of birth and made other comments to Chief Gass.[24] Madison

---

[24] Thus, Weaver knew Boykin, Jr. had enough cognitive ability to give his date of birth and an alias.

Dep. at 62:5-24. Madison also did not recall during his deposition seeing any evidence in any of the college police reports that Boykin, Jr. briefly passed out at the scene. *Id.* at 60:21-24, 66:4-8.

In her second affidavit, Weaver states that at no time at the scene did she observe Boykin, Jr. briefly pass out or otherwise lose consciousness. Weaver Second Aff., ¶ 6. Additionally, Chief Gass – who was also present at the time in question – testified that Boykin, Jr. did close his eyes but also repeatedly was able to talk and also gave the officers an alias of Jason Williams when asked his name. Gass Aff., ¶ 17. Finally, the Court notes Plaintiffs' medical expert, Dr. O'Conner, also viewed the video and testified that Boykin, Jr. "never lost consciousness," "did not pass out," and "was communicating with the officers." O'Connor Dep. at 33:9-19.

Consistent with Madison's deposition, the video shows Boykin, Jr.'s head go briefly limp as the officers moved him to Weaver's patrol car, but Boykin, Jr. was responding to the officers' questions both before and after that brief moment and he does not otherwise appear to lose consciousness. Boykin, Jr. was able to get into the back of Weaver's patrol car by himself. According to Altamirano, although Boykin, Jr. at first said he could not walk, he "ultimately agreed he could enter the patrol unit by himself and did so." Altamirano Aff., ¶ 11.

As noted, none of the officers at the scene reported Boykin, Jr. "briefly passed out." Thus, even if one were to credit Madison's characterization of the video as showing Boykin, Jr. "briefly pass[ing] out," there is no evidence that anyone *at the scene* was aware of that. Given the video shows Boykin, Jr. being cognizant throughout his arrest and the lack of any eyewitness evidence to the contrary, the two-second clip relied upon by Madison is not such "an apparent or obvious risk to [Boykin, Jr.'s health]" that shows Defendants had *actual* awareness of a serious medical need. *Williams*, 41 F.4th at 423, n.5; *see also Farmer v. Brennan*, 511 U.S. 825, 841-43 & n. 8 (1994) (noting that although certain obvious risks, such as a "longstanding, pervasive, well-

documented" record of inmate attacks, may allow a juror to determine a prison official had actual knowledge of a risk of attack, "courts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known, and juries should be instructed accordingly").

Given the uncontroverted evidence that Defendants thought Boykin, Jr.'s labored breathing immediately following the foot chase did not represent a substantial risk to Boykin, Jr.'s health, Plaintiffs cannot show Defendants were deliberately indifferent at the scene of the arrest. That necessarily excludes Hobbs and Scott from liability because Plaintiffs only challenge their conduct at the scene of the arrest.

Putting aside the issue of whether Defendants were subjectively aware that Boykin, Jr.'s labored breathing presented a substantial risk of serious harm, the evidence also does not show they failed to take reasonable measures to abate the situation. Boykin, Jr. had just run half a mile in the August heat and complained he could not breathe, and his legs hurt. He was moved to the back of an air-conditioned patrol car. When he asked for more air, Officer Hobbs increased the airflow. There is no evidence or argument that the actions the officers took—placing Boykin, Jr. in a shaded and cooler environment—were unreasonable.

Instead, Plaintiffs focus on what Defendants did not do. Plaintiffs assert that Defendants did not provide Boykin, Jr. with any "medical aid."[25] At the hearing, counsel stated Boykin, Jr.'s labored breathing did not improve after a couple of minutes of rest following the foot chase; thus, because there was no observed recovery while at the scene of the arrest, the officers should have

---

[25] During the hearing, Defendants Hobbs and Scott's counsel stated that throughout the entire case – in Plaintiffs' complaints, in all the depositions, in the deposition of Kevin Madison, and in Madison's expert report – the focus has been entirely "on the failure of the officers to summon medical aid." Dkt. No. 151 (Transcript) at 22:17-23. According to counsel, in light of their briefing on recent Fifth Circuit cases which "clearly stated that the law was not clearly established as to summoning medical aid, . . . Plaintiffs switched their arguments" to failure to provide any medical aid at all. *Id*. at 23:7-21 (further nothing Plaintiffs' counsel never state what that "medical aid" would be).

provided some "sort of actual medical intervention" (for example, calling EMS, providing an oxygen tank with a face mask if there had been one available or giving Boykin, Jr. water) instead of "nothing." Dkt. No. 151 (Transcript) at 41:2-46:22, *see also id.* at 47:12-19 ("It is not our position that any specific one medical act had to occur. Instead, it is our position that some level of medical involvement had to occur."). According to counsel, "[t]he objectively unreasonable act here is the act of having a person in labored difficult breathing for minutes and minutes and minutes and doing nothing more than really turning on the air conditioning and putting him in the shade. That's objectively unreasonable." *Id.* at 48:3-7.

In response, Weaver's counsel argued there is no evidence in the record (nor specific allegations in the complaints) as to what particular aid should have been provided by Defendants. *Id.* at 62:1-18. According to counsel, "the reason why they don't do that is because there's . . . no case law establishing [Defendants] have a duty to provide aid." *Id.* at 62:19-22.

The Court's analysis begins with a discussion of *Williams v. City of Yazoo, Mississippi* ("*Williams*"), 41 F.4th 416 (5th Cir. 2022), a case extensively relied upon by Plaintiffs, wherein the court did find such a duty.[26] In that case, Williams, a pretrial detainee, died in his cell after bleeding internally for hours. *Id.* at 419. His survivors alleged that law enforcement officers knew that Williams had been assaulted with a metal pipe and that he was vulnerable to internal bleeding if injured, yet they ignored requests for help from Williams, his family, and his fellow detainees, and left Williams to suffer in his cell until it was too late. *Id.* The Fifth Circuit affirmed the district court's denial of qualified immunity, holding that if these facts were proven at trial, the officials'

---

[26] The Court notes that approximately one month prior to this *Williams* case, the Fifth Circuit entered *Williams v. Zachary*, No. 21-60753, 2022 WL 2101518, at *4 (5th Cir. June 10, 2022), wherein the court affirmed the district court's grant of summary judgment, in part, because the arrestee had no known preexisting conditions. The Court discusses the second *Williams* case (referred to herein as "*Zachary*") below in its discussion of whether Weaver violated Boykin, Jr.'s clearly established constitutional rights by showing deliberate indifference to his medical needs.

indifference to Williams's serious medical needs violated his clearly established constitutional rights. *Id.*

The evidence, viewed in the light most favorable to Williams's survivors, showed that on the evening of Williams's death, Williams and his girlfriend (Smith) got into a physical altercation, and a witness alerted both Smith's family and the police. *Id.* Smith's family arrived first, and Smith's brother hit Williams on the side with either a bedrail or a metal pipe. *Id.* When the officers arrived a few minutes later, Williams told Officers Dean and Banks that he had been drinking and that Smith's brother had assaulted him with a pipe. *Id.* Williams lifted his shirt to show Dean where he had been hit, revealing superficial scratches. *Id.* During the conversation, Williams laid down on the porch as if trying to sleep. *Id.* at 420. Officer Harris handcuffed Williams and informed him that he was under arrest for domestic violence. *Id.*

Witnesses remembered what happened next differently. Smith recalled that Williams struggled to walk and collapsed on his way to the police car. *Id.* The officers said Williams was passively resisting arrest by forcing them to carry him to the vehicle. *Id.* Harris sprayed mace in Williams's eyes, the officers loaded Williams into the police car, and they brought Williams to the county detention center. *Id.*

Williams was in and out of consciousness during booking; he urinated on himself and slumped out of his chair to the ground; and he did not cooperate with the officers' requests for personal information. *Id.* Contrary to jail policy, no officer screened Williams for medical needs. *Id.* Dean and Banks escorted Williams to his cell, and again, Williams needed assistance walking. *Id.* Three detainees overheard Williams ask Dean and Banks for help during the walk to his cell, stating "I need my medical assistance, and I can't breathe," "I need some help. I need y'all to call

my people, my family so I can get my medication." *Id.* The officers did not respond to Williams's pleas. *Id.*

Importantly, Williams's mother (who was worried because she knew Williams had been in a scuffle at the house and likely needed medical attention) and other family members came to the jail and spoke to the officers. *Id.* During the conversation, Williams's mother told the group that Williams "grabbed his side and fell over" before his arrest. She explained that Williams's blood did not clot normally so that "if he got hurt in any kind of way . . . he would just bleed." *Id.* Williams's sister chimed in, noting that "[H]e could die!" *Id.* Banks responded that Williams had passed out twice in front of them, but Dean dismissed his concerns, suggesting that Williams was merely being uncooperative to avoid arrest. *Id.* The officials did not take any action in response to this information. *Id.*

> Once in his cell, Williams repeatedly called for his mother and for medical attention. He was unable to stand or use the toilet on his own. His cellmate propped him into a seated position against a wall, and he lost consciousness there.
>
> For two to three hours, Williams's fellow detainees banged on their cell doors and repeatedly yelled to Langston that Williams was having a medical emergency. Langston asked them to quiet down and told them that she could not do anything until her superior returned to the jail. She did not check on the detainees hourly, as required by prison policy.
>
> Around 2:15 a.m., officers found Williams dead in his cell.

*Id.* The autopsy report concluded that Williams had died of a laceration to his liver and extension internal bleeding. *Id*. at 420-21.

On appeal, the Fifth Circuit first addressed the deliberate indifference claims, holding that a reasonable jury could find from the following facts that the officers all knew of a high risk that Williams was bleeding internally yet failed to provide medical assistant for that harm:

> Taking Williams's allegations as true, Dean and Banks were aware of a substantial risk to Williams's health. Williams's family was so concerned about him that they

came to the station to tell law enforcement about his medical vulnerability. Williams's mother informed them that Williams suffered from a preexisting and life-threatening blood clotting condition that would cause him to bleed internally if he was "hurt in any kind of way." And Williams's sister reiterated to them how serious the condition was, explaining that Williams "could die" if injured.

In addition to knowing of Williams's diagnosis, Dean and Banks knew that Williams was hurt. When they first talked to Williams, he told them that he had been hit in the side with a metal pipe. Williams's mother later reminded them that he "grabbed his side and fell over" before his arrest. Dean and Banks also witnessed Williams struggling to walk and were aware that he passed out at least twice during his arrest and booking. If any doubt remained about Williams's need for care at that point, it was eliminated when Williams told Dean and Banks that he could not breathe and asked them for medical assistance while they escorted him to his cell. Contrast *Pearson v. Prison Health Serv*., 850 F.3d 526, 540 (3d Cir. 2017) (concluding that officer had no knowledge of risk because plaintiffs did not present any evidence "that the seriousness of [the detainee's] bleeding was communicated to her").

If these allegations are proven, this is not a close case: Williams's diagnosis, symptoms, and requests for help notified Dean and Banks of a significant risk that he was bleeding internally. *See Easter v. Powell*, 467 F.3d 459, 463–65 (5th Cir. 2006) (finding knowledge of risk based on combination of known heart condition, complaints of chest pain, and request for medication); *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999) (finding knowledge based on recent broken jaw diagnosis, complaints of pain, and requests for treatment).

The evidence construed in plaintiffs' favor would also allow a jury to find that Harris, Jaco, and VanCleave knew of Williams's serious medical situation. Like Dean and Banks, they were informed by Williams's family that he had a blood clotting condition that made any injury potentially fatal. They also saw Williams lose consciousness during booking. Unlike Dean and Banks, they did not know exactly how Williams had been injured—they only knew from his mother that he "grabbed his side and fell over." Although they did not know the full severity of Williams's injuries, a jury could find that the risk was obvious. *See Farmer*, 511 U.S. at 842, 114 S.Ct. 1970. Falling over can indicate a serious condition, particularly given Williams's symptoms, his family's grave concerns, and the officers' knowledge that "any kind" of injury could kill him. A jury could conclude that the officers put the clues together and were aware that Williams might be harmed. *See Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996) (inferring that law enforcement knew of risk from combination of potential trauma, complaints of pain, and abrasions); *see also Hare III*, 135 F.3d at 322–23, 325 (determining that law enforcement could infer suicide risk from threats of self-harm and family's concern).

*Id*. at 423-25.

Importantly, *Williams* is distinguishable on the subjective awareness prong. The primary dispute in *Williams* was whether the defendants were subjectively aware of Williams's blood clotting condition and risk of internal bleeding following being hit by a metal pipe. Concluding a jury could find the defendants were aware of that serious medical condition, the Fifth Circuit held the defendants could be liable for deliberate indifference for failing to reasonably provide medical care *for that condition*. *Id.* at 425 ("Once they learned of the combination of Williams's preexisting condition and his trauma, they knew of the risk to his life and were obligated to take reasonable action to abate *that risk*.") (emphasis added); *see also id.* at 425-26 (noting numerous "sources – Williams, his family, and his fellow detainees – told law enforcement that Williams needed medical attention for his life-threatening blood clotting disorder;" yet, the defendants ignored their requests for help, leaving Williams to bleed to death in his cell, before concluding that "[i]f proven at trial, this indifference to Williams's known, urgent medical needs violated due process.").

As discussed above, although Defendants knew that Boykin, Jr. was having labored breathing throughout their interaction with him at the scene of the arrest, Plaintiffs have not presented any evidence showing that Defendants had actual knowledge that Boykin, Jr. suffered from sickle cell trait, a preexisting and life-threatening condition. Thus, Plaintiffs must show that Defendants failed to provide medical care for Boykin, Jr.'s difficulty breathing. Plaintiffs recognize this by asserting that "*Williams* applies because Defendants knew about Boykin, Jr's serious medical condition (inability to breathe or difficulty breathing) and ignored his complaints." Dkt. No. 115 at 16.

Plaintiffs, however, have not shown deliberate indifference or wantonness predicated on a delay in medical treatment for difficulty breathing at the scene of the arrest. Weaver and TCPD officers placed a person who just finished a long foot chase in a seated position in an air-

conditioned vehicle, and Hobbs then increased the airflow to make Boykin, Jr. more comfortable. *See* Madison Dep. at 234:3-8. Plaintiffs have put forth no evidence that this was an unreasonable response or that not doing more "clearly evidence[s] a wanton disregard" for that person's need to recover normal breathing. *Gobert*, 463 F.3d at 346.

Additionally, Plaintiffs have not identified the specific medical care that they claim should have been provided to Boykin, Jr. at the scene of his arrest. When pressed, Plaintiffs' counsel suggested calling EMS[27] or providing oxygen (if it had been available) as examples (Dkt. No. 151 (Transcript) at 41:2-46:22, 105:17-18) – but there is no evidence or persuasive argument that those actions are *required* for a "reasonable" response to someone who was breathing heavily following a long foot chase.

Considering Plaintiffs have failed to establish that Defendants Hobbs and Scott acted with deliberate indifference to Boykin, Jr.'s medical needs at the scene of the arrest, and further considering it is only their conduct at the scene of the arrest that is at issue, the undersigned recommends the Court grant Hobbs and Scott's motion for summary judgment on the Fourteenth Amendment claims asserted against them.[28] Although the Court does not find Weaver acted with

---

[27] As pointed out in Weaver's reply, Dkt. No. 127 at 3, and argued by Defendants' counsel at the hearing, the failure to summons emergency medical assistance theory alleged in the complaint and asserted throughout Madison's revised report is not argued in Plaintiffs' responses. According to Weaver, Plaintiffs have apparently abandoned their claim that Weaver should have summoned emergency medical assistance in light of *Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021) and *Reed v. Nacogdoches Cnty*., No. 22-40126, 2023 WL 3563017 (5th Cir. May 19, 2023), recent Fifth Circuit cases which indicate failure to promptly call for emergency assistance in the face of a known, serious medical emergency was not a clearly established right until July of 2021, after the date of the events here.

[28] This disposes of Plaintiffs' supervisory liability claim against Scott. The supervisor liability claim against Scott is dependent on a successful allegation of a constitutional violation. *Cortez-Burlingame v. Galveston Cnty*., No. 3:18-CV-00183, 2020 WL 2062263, at *6 n. 2 (S.D. Tex. Apr. 27, 2020), *report and recommendation adopted sub nom. Burlingame v. Galveston Cnty*., No. 3:18-CV-00183, 2020 WL 4018830 (S.D. Tex. July 16, 2020), *aff'd sub nom. Cortez-Burlingame v. Galveston Cnty*., No. 20-40540, 2022 WL 1114413 (5th Cir. Apr. 14, 2022) (citing *Pena v. Givens*, 637 Fed. Appx. 775, 785 (5th Cir. 2015) ("Supervisory liability requires a constitutional violation by a subordinate.")). Because the undersigned determines that Boykin, Jr.'s constitutional rights were not violated, any claim for supervisor liability against Scott should be dismissed. *Id.* (citing *Luhellier v. Oyster Creek*, No. 3:18-CV-00281, 2019 WL 3419016, at *7 (S.D. Tex. July 10, 2019)).

deliberate indifference to Boykin, Jr.'s medical needs at the scene of the arrest, the Court next considers whether there is sufficient evidence to create a genuine dispute of material fact with respect to whether Weaver acted with deliberate indifference to Boykin, Jr.'s medical needs during transport to the Bi-State jail.

**B.    Whether Weaver had actual knowledge <u>during transport</u> that Boykin, Jr. faced a substantial risk of serious harm and failed to take reasonable measures to abate that risk**

There are several alleged facts that, at first glance, would make it easier for Plaintiffs to show Weaver had actual knowledge during transport that Boykin, Jr. faced a substantial risk of serious harm: Boykin, Jr.'s breathing never normalized and he continued to complain of trouble breathing and stated he was "about to pass out" during the first half of the transport; video shows Boykin, Jr. appeared to become unconscious and became non-responsive during the latter half of the transport; and, according to Madison, Weaver was able to observe from the front seat that Boykin, Jr. was "slumped over, unconscious, with agonal breathing, grasping for air." Madison Revised Report at 16.[29] However, the record evidence, viewed in the light most favorable to Plaintiffs, does not create a fact issue sufficient to show that Weaver actually had such knowledge, and the symptoms she was aware of were not so obvious to conclude otherwise.

First, Weaver explains that the first time she had actual knowledge Boykin, Jr. was in medical distress was after they arrived in the jail garage. Weaver Second Aff., ¶ 10. Ranger Mason opined in his second affidavit that, based on his professional experience, training and judgment, "a reasonable officer under the same circumstances would conclude from the video that the first

---

[29] Madison opines that Weaver's field of view from the front seat was the same as the field of view of the rear sear camera (noting, for example, that at time mark 16:36, Weaver stared at Boykin, Jr. for over 8 seconds but turned around and did nothing even though Boykin, Jr. was unconscious and gasping for air). Madison Revised Report at 16, 22.

time Weaver had actual knowledge of Boykin, Jr. being in serious medical distress is after they parked in the garage at the Bi-State jail facility." Mason Second Aff., ¶ 5.

Second, while Defendants' expert Dr. Hail opines that Boykin, Jr. went into extremis during the latter part of the transport when Boykin, Jr. was demonstrating a type of labored breathing consistent with agonal respirations, Hail Report at 12, it did not appear to Dr. Hail that Weaver was aware of this change in Boykin, Jr.'s physical condition because she was in the front seat driving. *Id.* at 13. In her second affidavit and throughout her deposition, Weaver testified she was not able to see Boykin, Jr.'s face or eyes during that time. Weaver Second Aff., ¶ 10. Weaver testified she could not see Boykin, Jr. because he was leaned to the side toward the middle of the vehicle.[30] Weaver Dep. at 59:25-60:4; 66:3-18.

Importantly, the accident reconstruction report of Alex Germane is unchallenged and supports Weaver's testimony. Germane Report at 19-24. Germane concludes that at the times when Boykin, Jr.'s face was in Weaver's direct line of sight, Boykin, Jr. appeared to be responsive and upright. Germane Report at 23. According to Germane, at no time when Boykin, Jr. was leaning forward or to his left was his face visible in Weaver's direct line of sight, and had his face been visible in Weaver's peripheral vision at any time, she would not have been able to visually ascertain the physical position and facial expressions of Boykin, Jr. due to the lack of sensitivity of peripheral vision. *Id.* Germane opines Weaver's behavior indicates that most of her attention was focused on driving. *Id.* at 24.

Third, while Boykin, Jr.'s breathing never normalized and he continued to complain of trouble breathing and stated he was "about to pass out," the experts do not opine Weaver had

---

[30] Plaintiffs allege Weaver could not see Boykin's face as Weaver drove past Wadley Hospital. Dkt. No. 7, ¶¶ 79-80; Dkt. No. 21, ¶¶ 28, 32.

subjective knowledge of the seriousness of Boykin, Jr.'s condition. Kerss opines Weaver was not subjectively aware that Boykin, Jr. became ill because she did not recognize the results that could occur from a medical condition that is hard to detect and rarely encountered by peace officers.

Kerss Report at 31. Kerss further explains as follows:

> Officer Weaver plainly mistook the shortness of breath and leg pain as fatigue and muscle cramps from running. She may also have misconstrued behaviors, including his lack of verbal responses enroute to the jail as acting, faking, and withdrawing in silence due to his arrest. Those types of actions are often demonstrated by individuals that have been arrested and they were not viewed as having been uncommon by Officer Weaver. Officer Weaver's tone and actions clearly changed after she got to the jail and, for the first time, became consciously aware that Mr. Boykin was having a medical crisis, and worked diligently to resuscitate him, as described . . . above. Officer Weaver[] did not have a sudden change of heart that caused her to transition from having intentionally ignored a serious medical need enroute to the jail, to one where she decided to try and save him. Rather, her actions, tone and demeanor make it clear that defendant Weaver had not been subjectively aware that Mr. Boykin needed care until that moment in the jail, at which time she responded reasonably. Her actions did not demonstrate a conscious indifference to his wellbeing.

*Id.*; *see also* Hail Report at 12-13 ("Even if [Boykin, Jr.] had been transported to the emergency department, emergency physicians would not have been aware of [Boykin, Jr.'s] underlying condition and more likely than not, would be unable to reverse the exertional sickling in time to prevent cardiac arrest."); *see also* O'Conner Dep. at 35:18-38:2 (explaining ECAST has a "wide spectrum of presentations" and is a "very uncommon event" so "it makes it difficult and challenging for medical professionals to recognize"), 46:18-22 (stating he would not expect nonmedical professionals, including police officers, to be able to recognize an ECAST event).

Plaintiffs nevertheless assert there is a fact question as to what Weaver knew during transport, especially considering that Boykin, Jr. continued to complain of difficulty breathing in the first half of the transport and then became non-responsive during the latter portion of the transport when it appears he passed out. Dkt. No. 151 (Transcript) at 95:1-19. At the hearing,

Weaver's counsel characterized Plaintiffs' core position is that "Weaver, based on what she was observing and hearing, should have perceived something different." Dkt. No. 151 (Transcript) at 63:23-64:4 (stating "that theory flies in the face" of Fifth Circuit precedent). Plaintiffs' counsel agreed that if Weaver simply misdiagnosed the symptoms, that is not actionable. *Id.* at 96:19-22.

During her deposition, Weaver stated she had the ability to drive Boykin, Jr. to the hospital while in transport, but she did not see that Boykin, Jr. was in medical distress. Weaver Dep. at 15:9-16:19 (further stating she would have immediately taken him to the hospital if she felt he was in medical distress). Weaver stated she did not believe Boykin, Jr. was under medical distress even when he was not responsive; rather, she believed Boykin, Jr. was ignoring her because of his felony charges. *Id.* at 84:25-85:7. Weaver further testified as follows:

> A.  Usually, when somebody's being charged with a bunch of felonies and we get closer to the jail, they kind of emotionally shut down, so they ignore me or they just don't want to talk. I've had people fake anxiety attacks. I've had people saying that they're going to pass out. It was just one of those situations, again, that I thought was happening.
>
> Q. So based off of your experience with other people who have complained about medical issues when they were charged with felonies, you believed that Mr. Boykin did not actually have the complaints he was voicing to you?
>
> A. Correct.
>
> Q. So even though he was telling you that he was going to pass out and that he couldn't breathe, you did not feel it was appropriate to get him medical care.
>
> A. I did not feel it was necessary to give him medical care at that time.
>
> Q. Okay. And you continued to believe that after he stopped responding to you during the transport to the jail?
>
> A. I did not believe that he was under medical distress whenever I was transporting him to the jail and when he was not responding to me.

Weaver Dep. at 84:3-85:2; *see also id.* at 91:9-24. According to Weaver, she was transporting Boykin, Jr. to the jail to see the nurse because "usually they are able to assist with getting them

water, checking their blook pressure, checking their pulse ox," and vitals. Weaver Dep. at 109:4-13; *see also* 105:25-106:1 ("I transported him to the jail to see the nurse.").

Plaintiffs suggest that Weaver was aware of facts from which she could infer that Boykin, Jr. was in serious medical distress—but Plaintiffs have not sufficiently shown facts that would allow a jury to conclude Weaver actually made that inference. Weaver's testimony and conduct – including the urgency in her voice at the Bi-State jail garage – indicate that she did not perceive such a risk.[31] Indeed, Plaintiffs' medical expert, Dr. O'Connor, acknowledged in his deposition that Weaver could have misconstrued Boykin, Jr.'s abnormal breathing pattern in the latter portion of the transport when things worsened and Boykin, Jr. became non-responsive, nothing "he was still breathing; he was still conscious." O'Connor Dep. at 73:5-18. Dr. O'Connor further testified that he recalled from the recording the urgency in Weaver's tone of voice at the Bi-State jail garage and thought Weaver "was very appropriate" and first recognized that Boykin, Jr. was "in extremis" at that moment in time when she first determined he was nonresponsive to her. *Id.* at 60:20-61:14.

Weaver's failure to realize there was a medical emergency negates any claim of deliberate indifference unless the risk of serious harm was so patently obvious that it should demonstrate she did, in fact, have that knowledge. *Batiste*, 458 Fed. Appx. at 356. However, in *Batiste*, the Fifth Circuit specifically held that a similar situation involving alleged symptoms of sickle cell trait "was anything but obvious" and could not "rise to the level of a serious medical need for which

---

[31] In affirming the officers' motion for summary judgment on the deliberate indifference claims in *Aguirre v. City of San Antonio*, 995 F.3d 395 (5th Cir. 2021), the Fifth Circuit noted that an officer's demeanor is relevant to determining whether he subjectively disregarded a risk of serious harm. In that case, the police's dashcam videos showed that the officers surrounding Aguirre—who was lying in a prone, "hog-tie-like" position, ultimately leading to his death from asphyxiation—were "smiling and laughing" before an officer attempted CPR. *Kelson v. Clark*, 1 F.4th 411, 420 (5th Cir. 2021) (citing *Aguirre*, 995 F.3d at 403–04). However, the court emphasized that the officers "quickly took on a sober aspect as Aguirre remained unresponsive, which suggests their initial manner was the result of subjective unawareness of the risk rather than knowledge of the risk and a deliberate choice not to take any precautions against the realization of the danger's fatal consequences." *Id.* (citing *Aguirre*, 995 F.3d at 421).

'treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required.'" *Id.* (quoting *Gobert*, 463 F.3d at 345, n.12).

The Court, having carefully reviewed the evidence of record in the light most favorable to Plaintiffs, does not find sufficient evidence to create a genuine issue of material fact that Weaver had actual knowledge during transport of a substantial risk of serious harm. However, even assuming there is sufficient evidence in the record for a factfinder to conclude that Weaver was aware of facts during the latter part of the transport from which the inference could be (and was) drawn that a substantial risk of serious harm existed, the Court does not find sufficient evidence to create a genuine issue of material fact that Weaver failed to take reasonable measures to abate that risk.

Plaintiffs assert Weaver should have provided aid, but the only aid they identify is that Weaver should have taken Boykin, Jr. directly to the hospital rather than to the jail. Counsel agreed at the hearing that Weaver's conduct must be more than inept, negligent, or even grossly negligent. Dkt. No. 151 (Transcript) at 96:23-97:8 (further arguing that Weaver "was deliberately indifferent, that she knew and she didn't care").

For support, Plaintiffs rely on *Nerren v. Livingston Police Dep't*, 86 F.3d 469 (5th Cir. 1996), where the Fifth Circuit affirmed the district court's denial of qualified immunity and found the arresting officers had violated a detainee's clearly established constitutional rights. In that case, Nerren had presented sufficient summary judgment evidence from which a reasonable juror could find an expressed intent to punish. *Id.* at 474 (noting the arresting officers' statement implied they were refusing medical attention to Nerren following an automobile accident because Nerren was not concerned about the other accident victims, and from this, a reasonable juror could conclude that Nerren was denied medical attention as punishment for fleeing the accident). Additionally, the

detainee's "face and chest were marred with abrasions, he was in [obvious] pain, and he informed the Arresting Officers that he needed medical attention" for his injuries. *Williams v. Zachar*y ("*Zachary*"), No. 21-60753, 2022 WL 2101518, at *4 (June 10, 2022) (quoting *Nerren*, 86 F.3d at 473) (bracket added in *Zachary*). "The detainee's need for care was obvious because the officers *knew* he 'had recently been involved in a multiple vehicle. . . accident.'" *Id.* (emphasis in *Zachary*). In *Nerren*, the arresting officers flat-out "denied [the detainee's] request for the express reason that he had fled the scene of the accident without regard for the plight of the other victims." *Id.*

Here, Weaver acknowledges some of her comments during transport may have been insensitive.[32] Having considered the entirety of the video records, the Court does not find any evidence that Weaver purposefully treated Boykin, Jr. incorrectly or intended to inflict pain or punish him. *See Cortez-Burlingame v. Galveston Cnty.*, No. 3:18-CV-00183, 2020 WL 2062263, at *6 (S.D. Tex. Apr. 27, 2020), *report and recommendation adopted sub nom.*, No. 3:18-CV-00183, 2020 WL 4018830 (S.D. Tex. July 16, 2020), *aff'd sub nom.*, No. 20-40540, 2022 WL 1114413 (5th Cir. Apr. 14, 2022). And, as discussed at length above in the discussion of the *Williams* case, Defendants were not on notice that Boykin, Jr. had a preexisting condition. *See Zachary*, 2022 WL 2101518, at *4 ("It is undisputed that [the detainee] complained only of wrist pain, back pain, and stomach discomfort—and only intermittently at that. And Zachary, unlike the officers in *Nerren*, was not on notice that [the detainee] had recently undergone significant trauma.

---

[32] Possibly referring to her statement in response to Boykin, Jr.'s saying he was going to pass out, "You'll be okay, just lean against the glass;" her later comment after Boykin, Jr. became non-responsive that "You know you're still going to jail either way, right;" and her comment after she applied the brakes for a stop sign, "You know somebody that passes out isn't able to stop themselves from falling forward, right. . . Fun fact."

(This is true even on the assumption that the booking-room video demonstrates [the detainee] was in significant pain and not just discomfort.)").[33]

Defendants' liability expert Kerss opines Weaver's actions and inferences throughout the transport process "were consistent with that of a reasonable peace officer facing the same or similar circumstances." Kerss Report at 30. Kerss opines the comments Weaver made at the scene of the arrest and during transport, including empathetic and non-flattering ones, demonstrate that she never drew an inference that there was a substantial risk of harm to Boykin, Jr. until she had parked at the sallyport and attempted to remove him from her patrol vehicle. *Id.* According to Kerss, once that recognition occurred, Weaver acted reasonably by summoning aid from Scott and attempting to resuscitate Boykin, Jr. *Id.* Plaintiffs never present a persuasive counter-argument to this train of logic.

Plaintiffs, with the vantage of now having lost a loved one, perhaps rightly take offense to Weaver's comments or the fact that Weaver drove *past* a hospital en route to the jail to be booked in (and presumably seen by a nurse). But Weaver's actions do not show she failed to properly respond to the situation as she understood it. Viewing the evidence most favorable to Plaintiffs, the most they could establish is that Weaver's understanding was wrong, i.e., that she was negligent, unobservant, or drew the wrong inferences from the situation—which, as explained above, is not sufficient to show deliberate indifference.

Considering Plaintiffs have failed to establish that Weaver acted with deliberate indifference to Boykin, Jr.'s medical needs during transport, and further considering the Court's above findings as to Weaver's conduct at the scene of the arrest, the undersigned recommends the

---

[33] As noted by Weaver's counsel at the hearing, in *Nerren*, there was "no other logical explanation for the medical risks [Nerren] was experiencing;" however, here "[t]here's no magic leap from leaving the inference or conclusion [Weaver] reached that [Boykin, Jr.] was physically exhausted to it's got to be something else." Dkt. No. 151 (Transcript) at 86:1-2, 10-12.

Court grant Weaver's motion for summary judgment on the Fourteenth Amendment deliberate indifference claims.[34]

## VI. QUALIFIED IMMUNITY

As an independent ground for the recommendation, the Court recommends Defendants' motions for summary judgment be granted on the basis of qualified immunity.

### A.    Applicable law

Under the doctrine of qualified immunity, "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Aguirre v. City of San Antonio*, 995 F.3d 395, 406 (5th Cir. 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, to establish whether Defendants are entitled to qualified immunity at the summary judgment stage, the Court must "engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party

---

[34] For this reason, the Court does not need to address Defendants' separate assertion that Dr. O'Connor's testimony that Boykin, Jr. might have survived if he had received medical attention sooner is insufficient to show "the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute." *De Paz Gonzalez v. Duane*, No. 21-11258, 2023 WL 5769339, at *5 (5th Cir. Sept. 6, 2023) (quoting *Slade v. City of Marshall*, 814 F.3d 263, 264 (5th Cir. 2016) (quotation omitted in *Duane*)).

Even if the Court were to consider medical causation, the Court would not be persuaded, as urged by Defendants' counsel at the hearing, that Dr. O'Connor's failure to testify within a "medical reasonable probability" would necessarily end the entire lawsuit. *See* Dkt. No. 151 (Transcript) at 31:16-32:11, 61:3-7. There is an important distinction between survival and wrongful death causes of action under § 1983. *Phillips ex rel. Phillips v. Monroe Cnty., Miss.*, 311 F.3d 369, 373 n.1 (5th Cir. 2002). Claims brought as part of a survival action, "redress[ ] any constitutional injuries suffered by the Decedent *before* his death" and require a different causation analysis. *Id.* (emphasis original); *see also Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 504 (5th Cir. 2022) ("Indeed, often survivors don't even have to prove the cause of the victim's death to recover. Wrongful death claims are different, though. Since they 'create new causes of action on behalf of the statutorily-designated persons in order to compensate them for the death of the decedent,' plaintiffs must prove the cause of the decedent's demise under state causation principles to recover."); *see also Duane*, 2023 WL 5769339, at *5 n. 5 (stating in a footnote that the plaintiffs voluntarily dismissed their claims brought on behalf of De Paz-Martinez, Jr.'s estate under Texas's survival statute, claims which were effectively derivative claims, so "naturally the Fifth Circuit's holding regarding causation only applied to the plaintiffs' wrongful death action asserted under § 1983"). This case involves both wrongful death and survival actions.

asserting the injury, show the officer's conduct violated a federal right." *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (cleaned up in *Aguirre*)). "The second prong of the qualified-immunity analysis asks whether . . . the right in question was 'clearly established' at the time of the violation." *Id.* (quoting *Tolan*, 572 U.S. at 656 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002))).

For a right to be "clearly established," the right's contours must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gonzalez v. Duane*, No. 4:20-CV-072-A, 2022 WL 4450282, at *4 (N.D. Tex. Sept. 23, 2022), *aff'd*, 2023 WL 5769339 (5th Cir. Sept. 6, 2023) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Individual liability thus turns on the objective legal reasonableness of the defendant's actions assessed in light of clearly established law at the time. *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

Although Supreme Court precedent does not require a case directly on point, existing precedent must place the statutory or constitutional question beyond debate. *Id.* at *5 (citing *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Clearly established law should not be defined at a high level of generality, but "it is not necessary that a previous case presenting identical facts exist in order for a right to be clearly established." *Frank v. Parnell*, No. 22-30408, 2023 WL 5814938, at *5 (5th Cir. Sept. 8, 2023) (citation omitted). This is because the central concept is that of fair warning: "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (quoting *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (internal quotations omitted in *Frank*)).

**B.    Analysis**

To overcome Defendants' assertion of qualified immunity, Plaintiffs must show there is a genuine issue of material fact concerning (1) "whether the officer[s] violated a constitutional right" and (2) "whether the right at issue was clearly established at the time of the alleged misconduct." *Williams v. Zachary* ("*Zachary*"), No. 21-60753, 2022 WL 2101518, at *3 (5th Cir. June 10, 2022) (quoting *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019)). In this case, the Court has discussed above the first question and found Defendants did not commit a constitutional violation. However, assuming that they did, the Court considers the second question – whether Defendants violated a *clearly established* constitutional right <u>at the time</u> of Boykin, Jr.'s arrest in 2019.

"A right is clearly established if it is one that is sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Reed*, 2023 WL 3563017, at *3 (quoting *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) (emphasis added in *Reed*) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam))). Plaintiffs bear the "heavy burden" to show that the right Defendants violated was clearly established. *Id.* (citing *Morrow*, 917 F.3d at 874). And a right is only clearly established where the relevant precedent "has placed the . . . constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In short, executive officers are entitled to qualified immunity except "the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Morrow*, 917 F.3d at 876).

To begin with, the Court must properly frame the right at issue "in light of the specific context of the case." *Id.* (citing *Cope*, 3 F.4th at 204 (noting courts must be careful not to "define clearly established law at a high level of generality")). Plaintiffs assert, relying on cases (including *Williams* and *Nerren* discussed above), that "the complaint is Defendant[s] refused to treat Boykin

and ignored Boykin's complaints to a known medical risk (Boykin's inability to breathe)."[35] *See* Dkt. No. 113 at 35; *see also id.* at 31, 35-39 (similar).

As an initial matter, Plaintiffs have not framed the right with adequate specificity. *See Zachary*, 2022 WL 2101518, at *4. Take *Reed* as an example. In that case, Fuentes was the lone control room operator at the jail charged with responding to the emergency intercom system which allowed pretrial detainees to page the control room and alert the jail staff to problems or emergencies. *Reed*, 2023 WL 3563017, at *1. On the day in question, Reed had a seizure and fell out of bed. *Id.* Almost one minute later, the emergency intercom rang in the control room. *Id.* When the emergency intercom rang, Fuentes was making a personal phone call to pay her brother's electric bill. *Id.* Over the next three minutes, the emergency intercom rang six more times, some of which Fuentes answered and some of which she ignored. *Id.* (telling Reed at one point "[t]hey're working on it – they'll be down in a minute").

Just over three minutes after the emergency intercom first rang, several officers arrived at Reed's dorm; meanwhile, the jail nurse (who was in the control room with Fuentes) left the control room and walked toward Reed's dorm. *Id.* After the officers could not find a pulse and observed no signs of breathing, they did not attempt to resuscitate Reed. *Id.* A little over one minute later, the jail nurse arrived and found Reed had a "faint" pulse and was "gasping for air." *Id.* Rather than start CPR, she left the dorm to get supplies to properly treat Reed. *Id.* Exactly two minutes after she had left the dorm, the jail nurse reentered and one minute later, an officer began chest compressions while another nurse performed rescue breaths. *Id.* at *1-2. The paramedics arrived

---

[35] Whereas Hobbs and Scott focus on the alleged failure to call for emergency assistance at the scene of the arrest, Dkt. No. 91 at 16-17, Weaver notes in her motion that Plaintiffs allege Defendants were deliberately indifferent by not providing or summoning medical care prior to leaving the arrest scene or (with regard to Weaver) on the way to the Bi-State jail. Dkt. No. 89 at 23-24.

approximately four minutes later and took over chest compressions. *Id*. at *2. Reed was taken to the hospital, where he was diagnosed with an anoxic brain injury. *Id*.

Reed sued Fuentes, the jail nurse, the sheriff, and the county under § 1983, claiming they violated his Fourteenth Amendment rights when they deliberately denied him access to medical attention. *Id*. The trial court granted summary judgment to the defendants. On appeal, the Fifth Circuit held Fuentes, the jail nurse, and the sheriff were entitled to qualified immunity on Reed's Fourteenth Amendment claims. *Id*. Notably, the Fifth Circuit, considering the specific factual context of that case, framed the issue very specifically as: "Whether it violates the Fourteenth Amendment for a jailer to ignore emergency intercom calls for three minutes and fourteen seconds while handling a personal phone call." *Id.*

Here, it is not a fair characterization to say Defendants "refused" to treat Boykin, Jr. or that they "ignored" his complaints. Boykin, Jr. was placed in an air-conditioned patrol car out of the sun, had air-conditioning placed on him, and was taken to a jail at where least Weaver knew had a nurse who could further evaluate him. Instead, the more specific complaint seems to be that Defendants should have done something more at the scene of the arrest or that Weaver should have taken Boykin, Jr. to the hospital rather than the jail. And without minimizing Boykin, Jr.'s distress, there has been no suggestion that Boykin, Jr. had a complete "inability" to breathe; instead, the evidence shows Defendants were aware that Boykin, Jr. had "difficulty" breathing, and experts have opined about Boykin, Jr.'s "abnormal" breathing pattern that coujld have indicated a serious condition. *See* O'Connor Dep. at 73:5-18 (acknowledging in his deposition that Weaver could have misconstrued Boykin, Jr.'s abnormal breathing pattern in the latter portion of the transport when things worsened because "**he was still breathing**; he was still conscious").

Regardless of the correct level of specificity in framing the question, Plaintiffs have not met the "heavy burden" to show that the right Defendants allegedly violated was "clearly established." *Reed*, 2023 WL 3563017, at *3 (citing *Morrow*, 917 F.3d at 874); *see also Zachary*, 2022 WL 2101518, at *4. Regarding the alleged failure to call EMS at the scene of the arrest,[36] the Fifth Circuit stated that "it was not until July 2021 that our court held that failing to promptly call for emergency assistance in the face of a *known*, serious medical emergency violates the Constitution."[37] *Id.* at *4 (citing *Cope*, 3 F.4th at 209 ("For these reasons, we now make clear that promptly failing to call for emergency assistance when a detainee faces a known, serious medical emergency—e.g., suffering from a suicide attempt—constitutes unconstitutional conduct.")). According to the Fifth Circuit in *Reed*, "it's also not clear that every reasonable officer would conclude that ignoring an emergency intercom—which *might* be alerting to a medical emergency—is the same as an officer *knowing* for a fact that a medical emergency is ongoing and not calling for emergency assistance like the officer in *Cope*." *Id.* (emphasis original).

This last point is pertinent here. As addressed above, the Fifth Circuit has already stated that a hereditary "sickling" phenomenon "is hardly the kind of obvious medical need that a non-medical expert would understand required attention," and "the trait appears through heavy breathing and fatigue, both of which are easily confused with symptoms of someone who had just run over a quarter mile while fleeing the police." *Batiste*, 458 Fed. Appx. at 357-58.  Considering Defendants were confronted with symptoms identical to what everyone would expect from a

---

[36] Recall that immediately after Boykin, Jr. failed to respond to Weaver's sternum rub upon arriving at the jail, Weaver started CPR and alerted Scott, who instantly called for an ambulance and jail medical staff.

[37] With regard to Reed's deliberate indifference claim against the jail nurse for delaying CPR, the Fifth Circuit held Reed pointed to no controlling case law that clearly governed the situation. *Reed*, 2023 WL 3563017, at *4.

physically exhausted person, it is far from clear that every reasonable officer would conclude – based on Boykin, Jr.'s repeated statements of difficulty breathing following a foot pursuit – that a medical emergency was ongoing which would require summoning or providing additional medical assistance. Thus, regarding Plaintiffs' complaint that emergency assistance should have been called sooner (or at the scene of the arrest), Boykin, Jr.'s right in this context was not clearly established on August 29, 2019, *see Cope*, 3 F.4th at 209, and Defendants are entitled to Qualified Immunity based on that complaint.

Plaintiffs' other complaint is that Defendants failed to "do anything meaningful," "provide" medical care themselves, "refused to treat," or otherwise "ignored" Boykin, Jr.'s urgent medical risk, Dkt. No. 113 at 35, including that Weaver should have taken Boykin, Jr. directly to the hospital (instead of anticipating aid from the jail), *id.* at 42. However, Plaintiffs point to no "existing precedent" that "place[s] the ... constitutional question[s]" in this case "beyond debate." *Zachary*, 2022 WL 2101518, at *4 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

"[T]o overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. This requires the plaintiff to "identify a case"— usually, a "body of relevant case law"—in which "an officer acting under similar circumstances ... was held to have violated the [Constitution]." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (citations omitted). Yet Plaintiffs point to no controlling case or body of relevant case law in which an officer acting under similar circumstances was held to have violated the Constitution.

Plaintiffs cite *Nerren v. Livingston Police Dep't*, 86 F.3d 469 (5th Cir. 1996), but that case does not place it "beyond debate" that Defendants violated Boykin, Jr.'s constitutional rights. The Fifth Circuit previously explained that in *Nerren*, the detainee's "face and chest were marred with

abrasions, he was in [obvious] pain, and he informed the Arresting Officers that he needed medical attention" for his injuries and further noting the detainee's need for care was obvious because the officers knew he "had recently been involved in a multiple vehicle. . . accident." *Zachary*, 2022 WL 2101518, at *4. Unlike the officers in *Nerren*, Defendants were not on notice that Boykin, Jr. had sickle cell trait, the cause of his death, and the Fifth Circuit has found that officers, who are not medical professionals, are entitled to qualified immunity when they misdiagnose the source of labored breathing to a foot chase rather than "sickling" brought on by exertion. *See Batiste*, 458 F. App'x at 357-58.

As discussed above, in *Batiste*, the plaintiffs' expert opined the decedent "died from 'sickling' [caused by physical exertion when he fled from the officers] that could have been avoided had he received immediate medical attention."[38] *Id.* at 355-58. In other words, even if the Court were to find the right at issue (however defined) was clearly established at the time of the alleged misconduct, the Court would find Plaintiffs failed to show Defendants' conduct was objectively reasonable in light of *Batiste* and the relevant case law.[39] Defendants had no knowledge of any pre-existing medical condition and were confronted with symptoms identical to what one

---

[38] To be clear, the officers in *Batiste* called EMS at the scene of the arrest. However, EMS was called per policy because the officers tased the detainee during his arrest, not to treat him for labored breathing after a foot chase or from sickling. *See*, *e.g.*, *Batiste*, 458 Fed. Appx. at 359.

[39] Compare this case with the Fifth Circuit's decision in *Wagner v. Bay City, Texas*, 227 F.3d 316 (5th Cir. 2000). There, officers pepper sprayed the plaintiff, cuffed him, and placed him on his chest in the back of the patrol car. *Dyer v. Houston*, 964 F.3d 374, 385 (5th Cir. 2020) (citing *Wagner*, 227 F.3d at 319). Instead of taking the plaintiff to the hospital to flush out the pepper spray, the officers drove him to jail. *Id.* There, they discovered the plaintiff had stopped breathing and attempted CPR; the plaintiff later died at the hospital. *Id.* (citing *Wagner*, 227 F.3d at 318–19). The Fifth Circuit concluded the officers were entitled to qualified immunity against a deliberate indifference claim. *Id.* (citing *Wagner*, 227 F.3d at 324–25). Among other reasons, the court explained that the officers heard the plaintiff moaning during the trip to jail (indicating he was still breathing), and that, when the officers realized he had stopped breathing in jail, they "immediately began CPR." *Id.* (citing *Wagner*, 227 F.3d at 325). Further, the suggestion that the officers take the plaintiff to the hospital was "based solely on a need to decontaminate the effects of the pepper spray," and there was no evidence "that the delay in the decontamination caused [the plaintiff] to stop breathing." *Id.* Thus, the court concluded there was no evidence that the officers "had knowledge that [the plaintiff] was in need of any other immediate medical attention." *Id.*

69

would expect from a physically exhausted person. The evidence shows the officers and witnesses at the scene of the arrest also believed that Boykin, Jr. was not in medical distress but tired because of a foot pursuit of nearly one-half mile in the August heat. Plaintiffs fail to show the actions Defendants took were not objectional reasonable to "treat" someone who was breathing heavily following a long run.

For the above reasons, Plaintiffs fail to show Defendants are not entitled to qualified immunity.

## VII. RECOMMENDATION

Based on the foregoing analysis, it is hereby

**RECOMMENDED** that Motion for Summary Judgment of Defendant Jerrika Weaver on Plaintiff and Intervenor's Deliberate Indifference Claim (Dkt. No. 89) and Motion for Summary Judgment of Defendants Brent Hobbs and William Scott on Plaintiff and Intervenor's Deliberate Indifference Claim and Defendant William Scott's Motion for Summary Judgment on Supervisory Liability Claim (Dkt. No. 91) be **GRANTED.** It is further

**RECOMMENDED** that Plaintiff's and Intervenor's claims against Weaver, Hobbs, and Scott be dismissed with prejudice.

<u>Objections</u>

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

SIGNED this the 20th day of October, 2023.


J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE